[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 21, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-10378
_____

D. C. Docket No.  02-80192-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHERVIN EMMANUEL,
a.k.a. Black Boy,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern  District of Florida

_____

(April 21, 2009)

Before TJOFLAT and CARNES, Circuit Judges, and THRASH,* District Judge.

_____
        *Honorable Thomas W. Thrash, United States District Judge for the Northern District of
Georgia, sitting by designation.

THRASH, District Judge:

This is a drug case.  The Appellant Shervin Emmanuel appeals his conviction for various drug trafficking offenses.  For the reasons discussed below, we AFFIRM.

## I.  Background

This case arises out of the investigation and prosecution of the Austin Knowles drug trafficking organization in the Bahamas. The Drug Enforcement Unit of the Royal Bahamas Police Force started investigating the organization in the early 1990s.  (R. Vol. 3, at 294.)  From the beginning, the Drug Enforcement Unit suspected that Emmanuel was a member of the organization, but did not initiate a full investigation of him until 2001.  (Id.)  In October 2001, Wayne Woodside, a sergeant in the Drug Enforcement Unit, sought permission from the Bahamian authorities to wiretap the telephones of Emmanuel and Austin Knowles, the head of the organization.  (Id. at 300-06.)  Sergeant Woodside made a written request for the wiretap to the Commander of the Drug Enforcement Unit.  (Id. at 295.)  The Commander reviewed Sergeant Woodside's request and forwarded it to the Assistant Commissioner of Crime, who also reviewed it and forwarded it to the Commissioner of Police.  (Id.)  The Commissioner of Police consulted with the Attorney General of the Bahamas and after the consultation, the Commissioner

2

approved the wiretap request for a period of 14 days. (Id. at 296.)

The Commissioner re-authorized the wiretap on the telephones of Emmanuel and Austin Knowles from October 2001 to November 2002. (Id.) During this time, the officers in the wire section of the Drug Enforcement Unit conducted the wiretap from a secure wire room. (Id.) Only officers in the wire section had access to the wire room and access to the room was controlled with a key available only to Sergeant Woodside and a few other high level advisors. (Id.) Other officers in the Drug Enforcement Unit were allowed in the secure wire room, but only with permission of the Commander. (Id. at 296-97.)

When the Drug Enforcement Unit has information relevant to another jurisdiction, its practice is to share the information with that jurisdiction. (Id. at 309.) And so, in March or April 2002, Sergeant Woodside told agents from the United States Drug Enforcement Administration that the wiretaps had revealed information relevant to the United States. (Id. at 298.) Sergeant Woodside requested permission to invite the agents to the wire room and the Commander granted his request. (Id. at 297.) The DEA agents helped the Drug Enforcement Unit prepare transcripts of intercepted conversations, but were not otherwise involved in the wiretap interceptions. (Id. at 312-14.) The Bahamian investigation remained an "independent investigation of these individuals for

3

violation of Bahamian law." (Id. at 298.)

The DEA began its investigation of the Austin Knowles organization in October 2001. (R. Vol. 6, at 1045.) The investigation began after the arrest of Gordon Hawton, who was caught trying to bring 60 kilograms of cocaine into the United States from the Bahamas. (Id. at 1045-46.) Hawton provided more information about the organization, including the names of several members. (Id. at 1047.) The DEA used the information to get a wiretap on the telephone of Ian Musgrove, another member of the organization who distributed the organization's drug shipments once they reached Florida. (Id.)

Information from the Bahamian and United States wiretaps provided the basis for a large-scale investigation of the organization. In July 2002, the Drug Enforcement Administration intercepted calls between Emmanuel and Musgrove. (R. Vol. 4, at 450-52.) In the calls, they discussed a past shipment of marijuana into the United States from the Bahamas. (R. Vol. 3, at 437-42; R. Vol. 4, at 447-48.) Musgrove was responsible for distributing the marijuana in Florida and collecting payment for Emmanuel. (Id.) In one conversation, Musgrove said that he had collected $60,000, but Emmanuel complained that he should have collected more. Emmanuel said that he needed the money to organize the distribution of drugs from Colombia. (Id. at 459, 463-65.) Using information from the calls,

4

DEA agents stopped Musgrove at Miami International Airport, and seized $61,000 from him. (R. Vol. 3, at 333-34, 342-44.) Musgrove told the agents that he planned to deliver the money to Emmanuel in Jamaica. (R. Vol. 4, at 466-67.) Musgrove was allowed to fly to Jamaica, where he met Emmanuel and told him about the seizure. (Id.)

In October 2002, Austin Knowles called Musgrove and told him to expect a shipment of cocaine. (R. Vol. 4, at 467-68.) Musgrove was responsible for distribution of the shipment once it reached Florida. He later received additional instructions regarding the shipment from Emmanuel. (Id. at 472.) The DEA learned more about this shipment from Kurt McBride. McBride had been involved in transporting drugs for the organization during the 1990s. By 2002, he was building boats. (R. Vol. 6, at 832-33.) In spring 2002, Austin Knowles recruited McBride to build two drug-smuggling boats for the shipment of cocaine. (Id. at 833-34.) Austin Knowles also told McBride that Emmanuel was his "right-hand man," that Emmanuel "was the one that handled the cocaine," and after this shipment, Emmanuel would take over as head of the organization. (Id. at 835-36, 873-75.)

On October 7, 2002, Austin Knowles asked McBride to take 300 kilograms of cocaine from the Bahamas to Florida. (Id. at 838-39, 845.) McBride agreed to

5

transport the cocaine. On October 20, 2002, he left Florida and piloted one of the boats, the Defense Rests, to the Bahamas. (Id. at 847, 863.) When the boat was close to the Bahamas, Austin Knowles called McBride and told him that there were mechanical problems with the boat that was supposed to meet him. (Id. at 848.) During this time, the Drug Enforcement Unit intercepted calls between Emmanuel and Austin Knowles in which they discussed engine and propeller problems on one of their boats, and whether they should ask McBride to meet their boat closer to the island. (R. Vol. 4, at 635-39.)

McBride eventually found the boat that had the cocaine and loaded the shipment into secret compartments on the Defense Rests. (R. Vol. 6, at 848-52.) In another intercepted phone call, Emmanuel directed an associate to go to a certain location and look out for law enforcement activity. (R. Vol. 5, at 678-79.) On the way back to the United States, McBride was stopped by Bahamian law enforcement agents. The Defense Rests was then towed by the United States Coast Guard to Florida. (R. Vol. 6, at 853-54.) After 397 kilograms of cocaine was found in the boat, McBride was arrested. (Id. at 855-56, 859, 1022-26.) The next day, Emmanuel was on the phone with Austin Knowles, and the two discussed McBride's arrest and seizure of the cocaine. (R. Vol. 5, at 690-92.)

Despite this seizure, the organization continued trafficking in cocaine. On

October 30, 2002, Emmanuel and Austin Knowles talked about the logistics of a second shipment of cocaine. (R. Vol. 5, at 694-96.) Emmanuel also instructed an associate on how to bring a boat into Florida without attracting attention from law enforcement officers. (Id. at 698-700.) The second shipment of 340 kilograms of cocaine was made later that day. (R. Vol. 6, at 952.) Once in Florida, the shipment was divided up for delivery to various distributors, including 35 kilograms for "Shervin's people in Jamaica .... " (Id. at 965-66.)

The next shipment took place on November 18, 2002. For this shipment, Austin Knowles called Emmanuel to make sure that he would check the seaworthiness of the ship. (R. Vol. 5, at 705-08.) One of Emmanuel's associates reported to him that "everything cool" and that the cocaine had been loaded. (Id. at 709-13.) The next day, Emmanuel told another one of his associates that "his guys" had transferred the cocaine and that the shipment was "on their way" to Florida. (Id. at 714-16.) This time, however, law enforcement officers were able to stop the shipment and seized 370 kilograms of cocaine. (R. Vol. 6, at 1035-39, 1041-42.) After this seizure, one of Emmanuel's associates suggested that the seizures were because of a wiretap. (R. Vol. 5, at 717-19.) But Emmanuel disagreed, saying that his crew did not use telephones while they were making shipments. (Id. at 719.)

7

The wiretaps and seizures provided the United States government with significant evidence against the Austin Knowles organization. On December 12, 2002, a federal grand jury in the Southern District of Florida returned an indictment against Emmanuel and other members of the Austin Knowles organization. Emmanuel was charged with conspiring to import cocaine into the United States, attempting to import cocaine into the United States, possessing with intent to distribute cocaine while on board a vessel of the United States, and two counts of importing cocaine into the United States. Emmanuel was arrested on January 23, 2006.

Before his trial, Emmanuel filed a motion to suppress evidence obtained from the Bahamian wiretap. Emmanuel argued that the wiretap was illegal and that any evidence from the wiretap should be excluded. After conducting a hearing on the issue, the district court denied the motion. (R. Vol. 3, at 374.) On August 7, 2006, Emmanuel proceeded to a trial by jury. At trial, evidence was introduced from the Bahamian and DEA wiretaps. Three of Emmanuel's codefendants testified against him. The jury found Emmanuel guilty on all five counts. On January 8, 2007, the district court sentenced Emmanuel to 348 months of imprisonment.

Emmanuel appeals his conviction on four grounds. First, he argues that the

district court should have granted the motion to suppress evidence obtained from the Bahamian wiretap. Second, he argues that there was insufficient evidence to convict him. Third, he argues that the district court should have declared a mistrial after one of the government's witnesses made a comment regarding Emmanuel's bail status. Fourth, he argues that the district court should have excluded opinion testimony regarding the meaning of some of the intercepted phone calls.

## II. Discussion

### A.    The Bahamian Wiretap Evidence

Emmanuel filed a pre-trial motion to suppress evidence obtained from the Bahamian wiretap. He argued that the wiretap was illegal and that any evidence from the wiretap should be excluded. After conducting a hearing on this issue, the district court denied the motion. A denial of a motion to suppress presents a mixed question of fact and law. United States v. Delancy, 502 F.3d 1297, 1304 (11th Cir. 2007). We review the findings of fact for clear error and the interpretation and application of law de novo. Id.

The general rule is that evidence obtained from searches carried out by foreign officials in their own countries is admissible in United States courts, even if the search would not otherwise comply with United States law or the law of the

foreign country. United States v. Rosenthal, 793 F.2d 1214, 1230 (11th Cir. 1986); United States v. Morrow, 537 F.2d 120, 140 (5th Cir. 1976).[1]  But this Circuit has recognized two narrow exceptions to this rule.  The first exception is that evidence from foreign searches is inadmissible if the conduct of the foreign officials during the search "shocks the judicial conscience." Id.  This exception is based on a federal court's inherent "supervisory powers over the administration of federal justice." Birdsell v. United States, 346 F.2d 775, 783 n.10 (5th Cir. 1965); United States v. Barona, 56 F.3d 1087, 1096 (9th Cir. 1995).  The second exception is that evidence from foreign searches is subject to the exclusionary rule if American law enforcement officials substantially participated in the search or if the foreign officials conducting the search were actually acting as agents for their American counterparts. Rosenthal, 793 F. 2d. at 1231.  This exception is based on a defendant's Fourth Amendment rights. See Morrow, 537 F.2d at 140.  This Court followed this line of cases in deciding United States v. Behety, 32 F.3d 503, 510 (11th Cir. 1994) which Emmanuel relies upon in arguing that the Bahamian wiretap evidence should be suppressed.

Emmanuel argues that the first exception applies to this case because the

_____

[1]Decisions of the former Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

10

conduct of the Bahamian officials "shocks the judicial conscience." He says that the method for obtaining a wiretap under Bahamian law does not allow for judicial review by a neutral magistrate and "is so antithetical to our system's sense of fairness that this Court should find that the evidence is excludable." (Appellant's Br. at 40.) The "shocks the judicial conscience" standard is not well-defined. But it is clear enough that the conduct of the Bahamian officials does not shock our conscience. Sergeant Woodside's request for a wiretap on Emmanuel's telephones went through four levels of review and the request had to be renewed every 14 days. The "shocks the judicial conscience" standard is meant to protect against conduct that violates fundamental international norms of decency. United States v. Mitro, 880 F.2d 1480, 1483 (1st Cir. 1989). Fundamental international norms of decency do not require judicial review in all jurisdictions of applications to intercept wire communications. Therefore, the Bahamian wiretap evidence is not excludable under the first exception to the general rule of admissibility.

Next, Emmanuel argues that the second exception applies to this case because "the Bahamian officials did, in fact, act as agents of the United States in a joint venture to interdict this [sic] narcotics." (Appellant's Br. at 32). But this exception is based on a defendant's Fourth Amendment rights. Emmanuel cannot show that he is entitled to the protections of the Fourth Amendment. In United

11

States v. Verdugo-Urquidez, 494 U.S. 259 (1990), the Supreme Court held that the Fourth Amendment does not apply to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country. Aliens do enjoy certain constitutional rights, but not the protection of the Fourth Amendment if they have "no previous significant voluntary connection with the United States ...." Id. at 271. Here, Emmanuel was a citizen and resident of the Bahamas with no significant voluntary attachment to the United States. And the wiretapped telephones were located in the Bahamas. Emmanuel's participation in a drug trafficking conspiracy directed at importing drugs into the United States does not mean that he was part of the "national community" protected by the Fourth Amendment. Id. at 265. Indeed, he was entirely outside of that community. "Under these circumstances, the Fourth Amendment has no application." Id. at 275. Because the Fourth Amendment does not apply to nonresident aliens whose property is searched in a foreign country, there is no need to decide whether the Bahamian officials acted as agents of the United States or whether the wiretap was a joint venture. The Fourth Amendment exclusionary rule simply is not available to Emmanuel with respect to the Bahamian wiretap evidence.

In describing the relevant law on this issue, Emmanuel cites to Behety, a

case decided by the Eleventh Circuit after <u>Verdugo-Urquidez</u>.  In <u>Behety</u>, the defendants were on board a ship in Guatemala when Guatemalan officials conducted a search of the ship and found cocaine.  An agent from the Drug Enforcement Administration went aboard the ship and videotaped the search, but did not assist the Guatemalan officials.  The defendants argued that evidence from the search was inadmissible because American officials substantially participated in the search.  The Court held that "the DEA agents' presence and even videotaping of the search [did] not constitute the level of participation this exception contemplates."  <u>Behety</u>, 32 F.3d at 511.

It is certainly true that the Court in <u>Behety</u> did not discuss <u>Verdugo-Urquidez</u>, and did not explicitly address the antecedent question of whether the defendants had a "voluntary attachment to the United States" that would entitle them to the protections of the Fourth Amendment.  We are bound to apply the precedent of a prior panel even if we are convinced that the prior panel is mistaken about the proper analysis, and even if the prior panel completely overlooked a Supreme Court decision on point.  But our prior panel precedent rule does not mean that we are obliged to ignore <u>Verdugo-Urquidez</u> in this case.  The critical factual distinction is that in <u>Behety</u> one of the defendants was a resident alien and the other defendant was a United States citizen.  <u>Behety</u>, 32 F.3d at 509-10. We

13

are bound only by the holding of the case and not by dicta. Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003). The Court in Behety did not, and could not, decide whether the Fourth Amendment applies to a search of a nonresident alien in a foreign country. That question is squarely presented in this case and so we are free to rely on the analysis and holding of Verdugo-Urquidez. The Fourth Amendment exclusionary rule does not apply to the interception of wire communications in the Bahamas of a Bahamian resident. Emmanuel has not shown that his constitutional rights were violated by admission of the Bahamian wiretap evidence. Therefore, the district court properly denied the motion to suppress.

Emmanuel also argues that the district court erred in admitting written evidence regarding approval of the Bahamian wiretap. At trial, Sergeant Woodside explained the procedure under Bahamian law for getting approval for a wiretap. (R. Vol. 4, at 589.) The government asked Sergeant Woodside if he could identify Trial Exhibit 2-B and he said that it was "an approval from the Commission of Police." (Id.) The government then moved to submit the written approval into evidence. (Id. at 591.) Emmanuel objected on the grounds that the evidence contained inadmissible hearsay. The district court overruled the objection. We review a district court's admission of evidence for an abuse of

14

discretion. <u>United States v. Arbolaez</u>, 450 F.3d 1283, 1289 (11th Cir. 2006). Furthermore, "evidentiary and other nonconstitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error has no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." <u>United States v. Hawkins</u>, 905 F.2d 1489, 1493 (11th Cir. 1990).

Before addressing this issue, it is worth pointing out what Emmanuel does not say. Emmanuel does not say that the district court erred in allowing the written approval into evidence during the pre-trial suppression hearing. When the government presented the written approval at the suppression hearing, Emmanuel did not raise a hearsay objection. (R. Vol. 3, at 331.) And in his brief to this Court, Emmanuel did not mention the suppression hearing, but rather specifically referred to "the Government's Trial Exhibit 2-B." (Appellant's Br. at 38.) The focus of our review, therefore, is on the effect the evidence had on the trial, not the suppression hearing.

With this in mind, we do not decide whether the written approval of the Bahamian wiretap contained inadmissible hearsay because it is unlikely that the evidence affected the Appellant's substantial rights. The written approval merely

supplemented the narrative structure of the government's case, providing a transition from Sergeant Woodside's initial investigation of the Austin Knowles organization to discussing the wiretap on Emmanuel's phones. The evidence does not affect any element of the crimes at issue in this case nor any defense asserted by Emmanuel. The jury's verdict was not influenced by evidence that the Commissioner of Police approved the Bahamian wiretap, but rather by evidence of Emmanuel's own incriminating conversations and corroborating evidence involving seizures of drugs and drug money.

Emmanuel also argues that admitting the written approval of the Bahamian wiretap into evidence violated his Sixth Amendment right to confront the witnesses against him. (Appellant's Br. at 38.) He says that the evidence is testimonial hearsay as defined by Crawford v. Washington, 541 U.S. 36, 52 (2004). At trial, Emmanuel made a hearsay objection to the evidence, but did not mention the Confrontation Clause. "A hearsay objection to testimony at trial, standing alone, does not preserve a constitutional challenge under the Confrontation Clause for appeal." Arbolaez, 450 F.3d at 1291 n.8. Because Emmanuel did not make a timely Confrontation Clause objection at trial, we review for plain error only. Id. at 1291. To demonstrate plain error, there must be an "(1) error (2) that is plain and (3) that affects substantial rights." Id. But we do

16

not decide whether allowing the written approval into evidence was error because, as discussed in connection with the hearsay objection, it is unlikely that the evidence affected Emmanuel's substantial rights. He has not shown that any alleged error by the district court in allowing the written approval into evidence requires reversal.

B.    Sufficiency of the Evidence

Emmanuel argues that there was insufficient evidence to support the jury's verdict. We review challenges to the sufficiency of evidence de novo, viewing the evidence in the light most favorable to the government. United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999). "A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." Id.

The record from the trial demonstrates that there was sufficient evidence to support the jury's verdict. The evidence showed that Emmanuel was a member of the Austin Knowles organization and participated in the organization's drug trafficking. The primary evidence of Emmanuel's participation was his own incriminating conversations, intercepted from both the Bahamian and United States wiretaps. In these conversations, Emmanuel discussed drug payments, plans to ship large amounts of cocaine to Florida, the availability of drug

17

smuggling ships, and security for the smuggling operations. All of this evidence was corroborated by seizures of drugs and drug money. The government also presented testimony from coconspirators, each of whom knew about Emmanuel either through personal dealings with him or because of co-conspirator statements by Austin Knowles.

In the face of this evidence, Emmanuel focuses on alleged omissions in the government's case and arguments relating to the credibility of the government's witnesses. But "[i]t is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." See United States v. Garcia, 447 F.3d 1327, 1334 (11th Cir. 2006). And "[t]o the extent that Appellant['s] argument depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination and the court of appeals may not revisit the question." Chastain, 198 F.3d at 1351. Emmanuel has not demonstrated that there was insufficient evidence to support the jury's verdict.

C.     Motion for Mistrial

At trial, the government called Sergeant Tyrone Turnquest of the Royal Bahamas Police Force as a witness. Sergeant Turnquest identified several voices on taped recordings of phone calls, including the voice of Emmanuel. During the

18

government's direct examination, Sergeant Turnquest explained how he knew

Emmanuel:

> Q. Can you describe the frequency of the amount of time you would deal
> with him? Not where or the circumstances, just about how often you would
> deal with him.
> A. Each year from 1996 to 2000, during the first Friday of June, that
> weekend around there, I would have seen him the period '96 to '97 as he
> was signing in as a condition of bail.
>     THE COURT: Let me stop you for a second. You don't have to tell
> us how you would have seen him, but the question is tell us the number of
> times you would have seen and talked with Mr. Emmanuel.
>     MR. SCHUMACHER: Judge, I will reserve a motion as well.

(R. Vol. 4, at 570-71.) Later, out of the presence of the jury, defense counsel

moved for a mistrial based on Sergeant Turnquest's comment about Emmanuel's

condition of bail. (Id. at 640-41.) The district court denied the motion, stating

that "it would be better had it not been said, but it was a fleeting reference and . . .

is [not] the sort of thing that rises to the level of justifying the grant of a mistrial."

(Id. at 644.)

We review a decision not to grant a mistrial for abuse of discretion. United

States v. Newsome, 475 F.3d 1221, 1227 (11th Cir. 2007). The district court is in

"the best position to evaluate the prejudicial effect of a statement or evidence on

the jury." Id. Emmanuel must show that his "substantial rights are prejudicially

affected. This occurs when there is a reasonable probability that, but for the

19

remarks, the outcome of the trial would have been different." Id.

Emmanuel has not shown that Sergeant Turnquest's comment prejudiced his substantial rights. The mere utterance of the word jail, prison, or arrest does not, without regard to context or circumstances, constitute reversible error per se. United States v. Villabona-Garnica, 63 F.3d 1051, 1058 (11th Cir. 1995). In a case, such as this one, where the comment is brief, unelicited, and unresponsive, adding nothing to the government's case, the denial of a mistrial is proper. Id.; see also United States v. Beasley, 2 F.3d 1551, 1559 (11th Cir. 1993) (witness said he met the defendant in prison in 1970's in response to question about length of acquaintance); United States v. Veteto, 701 F.2d 136, 139-40 (11th Cir. 1983) (witness said that the defendant had been in prison before in response to question about why the defendant wanted a machine gun). Moreover, in light of the substantial evidence against Emmanuel, it is unlikely that, but for the reference to his condition of bail, the outcome of the trial would have been different.

Emmanuel also says that the district court should have given a "curative instruction as a lesser alternative to the mistrial." (Appellant's Br. at 51.) Because Emmanuel never requested a curative instruction, he essentially faults the district court for failing to sua sponte give a curative instruction. But the decision not to give a curative instruction was well within the district court's discretion. As the

20

government points out, the comment was "but a brief reference during a relatively long trial," and a curative instruction could have drawn "unwarranted attention to the comment," something that Emmanuel wanted to avoid. (Appellee's Br. at 36.) "To be sure, there are occasions when a trial judge, without request from counsel, interrupts the proceedings to deliver a cautionary instruction to eliminate undue prejudice. It does not follow, however, that the failure of the court to interrupt the proceeding to give a cautionary instruction amounts to constitutional error." Willis v. Kemp, 838 F.2d 1510, 1520 n.19 (11th Cir. 1988). Emmanuel, therefore, has not demonstrated that the district court abused its discretion by not granting a mistrial or giving a curative instruction.

D.    Opinion Testimony Regarding Drug Codes and Jargon

At trial, the government also offered Sergeant Woodside as an expert in interpreting drug codes and jargon used during the taped conversations. Defense counsel made a number of objections to Sergeant Woodside's testimony, including improper opinion, relevance, narrative, and improper summary. The district court overruled the objections, explaining that "15 years experience of this officer, and his background in analyzing the code words is enough [under Rule 702] to put it in front of the jury." (R. Vol. 4, at 615.) We review the district court's decisions regarding the admissibility of expert testimony for abuse of discretion. United

21

States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004). Furthermore, "evidentiary and other nonconstitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." Arbolaez, 450 F.3d at 1290.

The operations of narcotics dealers, including drug codes and jargon, are proper subjects of expert testimony. United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006). Emmanuel argues that Sergeant Woodside's testimony "went far beyond testimony concerning drug parlance and jargon." (Appellant's Br. at 53.) He says that the government used Sergeant Woodside as a summary witness and cites to cases from the Second Circuit to support his argument. The concern is that "particular difficulties, warranting vigilance by the trial court, arise when an expert, who is also the case agent, goes beyond interpreting code words and summarizes his beliefs about the defendant's conduct based upon his knowledge of the case." United States v. Dukagjini, 326 F.3d 45, 53 (2d Cir. 2003). Although courts often approve of testimony interpreting drug code words, such expert testimony may unfairly provide the government with an additional summation by having the expert interpret the evidence, and may come dangerously

22

close to invading the province of the jury. Id.; see also United States v. Nersesian, 824 F.2d 1294, 1308 (2d Cir. 1987).

Most of Sergeant Woodside's testimony was specific and closely related to his interpretation of drug codes and jargon. Sergeant Woodside explained that "car" means boat; "water" sometimes means fuel and other times means the ocean; "the road could get bad" means the weather could get bad; "pothole" means there is a delay with a shipment; and "coming up fishing" means coming directly to an island. Other codes and jargon dealt directly with drugs. Sergeant Woodside explained that "two dollars" means $2,000; "D Boys" means agents from the Drug Enforcement Administration; "scanner" means wiretap; "movements" means law enforcement activities; "girls" means cocaine; "pouring that concrete" means exchange of the cocaine; "a check for $300" means 300 kilos of cocaine; and "for them to find the girls with this guy, they got to pick him out of the water, and, you know, and cut" means they have to take the boat out of the water and cut it up to find the cocaine. This testimony was properly admitted. Garcia, 447 F.3d. at 1335.

Some of Sergeant Woodside's testimony, however, was not specific to his interpretation of drug codes and jargon. At times, his testimony went beyond interpreting code words to interpret conversations as a whole. Nevertheless, it is

23

unlikely that the testimony affected Emmanuel's substantial rights. During Sergeant Woodside's testimony, the district court emphasized that "[i]t is going to be up to the jury whether the testimony is credible that this means something as opposed to something else. That is one of those jury issues that the jury will have to determine." (R. Vol. 4, at 615.) Moreover, the primary evidence against Emmanuel consisted of his own incriminating conversations, intercepted from both the Bahamian and United States wiretaps. Even if none of Sergeant Woodside's expert testimony was admissible, the jury could have easily interpreted the recorded conversations as involving drugs based on other evidence in the case, including actual seizures of drugs and drug money and testimony from coconspirators. Considering the substantial evidence against Emmanuel, Sergeant Woodside's opinion testimony that went beyond interpreting drug codes and jargon was merely cumulative and was not essential to the jury's verdict. See Dukagjini, 326 F.3d at 62. Therefore, any alleged error by the district court in allowing Sergeant Woodside's opinion testimony into evidence does not require reversal.

### III. Conclusion

For the reasons discussed above, the judgment of the district court is AFFIRMED.