[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-14422
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 30, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-00256-CR-1-WS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TASHA MICHELLE BLACKBURN,
BARRY JAY SULLIVAN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

(September 30, 2010)

Before CARNES, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Tasha Michelle Blackburn and Barry Jay Sullivan appeal from their convictions for conspiracy to possess with intent to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 ("Count 1"). In addition, Sullivan appeals from his convictions for possession with intent to distribute approximately 31 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 ("Count 3"), and possession with intent to distribute approximately 23 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 ("Count 4").

On appeal, Blackburn argues that the district court erred by denying her motion to suppress evidence seized from her bedroom. She contends that, although her consent to police officers' request to search her home was voluntary, her consent was tainted by a preceding illegal traffic stop, and the evidence seized pursuant to her consent should have been suppressed as the fruit of the illegal traffic stop.

Sullivan argues that the evidence was insufficient to support all of his convictions. In support of this argument, Sullivan asserts that the government's cooperating witnesses were motivated to provide testimony against him in order to receive more lenient sentences in their criminal cases. He further argues that several of the government's cooperating witnesses—including Ham Xaysana and

2

Benjamin Adams—may have fabricated their testimony against him and Blackburn.

Finally, Sullivan and Blackburn contend that the court erred by permitting a police officer, Jeffrey Stone, to provide his opinions regarding the significance of certain items—a gas torch, digital scales, crystal methamphetamine, and a piece of paper with the figure "1700" written on it—that were seized from the bedroom shared by Blackburn and Sullivan. They argue that the court should not have admitted these opinions as expert testimony under Fed.R.Evid. 702 because Stone's opinions invaded the fact-finding province of the jury, and included improper speculation. Sullivan and Blackburn further assert that the government did not adequately establish how Stone's experience as a narcotics officer could be applied reliably to the facts of the present case. They also argue, in the alternative, that the government impermissibly sought to avoid meeting the requirements for expert testimony, set forth in Fed.R.Evid. 702, by introducing Sullivan's opinions as those of a lay witness. The government responds that any error that the district court may have made in admitting Stone's opinion testimony was harmless, in light of the substantial evidence of Blackburn's and Sullivan's guilt.

For the reasons set forth below, we affirm.

## I.

A federal grand jury indicted Blackburn and Sullivan, charging them with the offenses described above. In addition, the jury charged Blackburn with possession of pseudoephedrine with knowledge that it would be used to manufacture a controlled substance, in violation of 21 U.S.C. § 841(c)(2) ("Count 2").[1]

Blackburn filed a motion to suppress, asserting that the court should suppress pseudoephedrine pills seized from her car as the fruit of an unlawful traffic stop and subsequent search of her car. Blackburn also sought to suppress physical evidence seized from her home, contending that this evidence also constituted the fruit of the illegal traffic stop.

The court held a suppression hearing, during which Samuel Entrekin, a police officer employed by the Mobile, Alabama, Police Department ("MPD"), testified that, around midnight on May 22, 2009, he was wearing a police uniform and was driving a marked police car on Calvert Road. As Entrekin approached the intersection of Calvert Road and Airport Boulevard, he observed that a white Blazer was preparing to turn left onto Calvert Road from Airport Boulevard.

---

[1] Immediately before trial, the court granted the government's motion to dismiss Count 2 against Blackburn as a result of the court's earlier order suppressing the pseudoephedrine pills discovered in her car.

4

Entrekin next observed that the Blazer stopped and made a "U-turn" on Airport Boulevard instead of turning left onto Calvert Road. Entrekin concluded that this U-turn was suspicious, because he believed that it constituted evasive action by the driver to avoid his police car. Accordingly, Entrekin stopped the Blazer.

Entrekin further testified that, after he stopped the Blazer, the driver of the car, Blackburn, informed him that she did not have a driver's license on her person, but that she had been issued a license by the state of Mississippi. Entrekin explained that, when an individual could not provide him with proper identification, he would detain the individual in the backseat of his police car until he was able to identify the person. Based on the information that Blackburn provided to him, Entrekin determined that Blackburn had been issued a driver's license by Mississippi, but that the license was suspended. Entrekin further explained that, pursuant to MPD policy, when an officer discovered that an individual was not legally permitted to drive her car, the officer should first inventory the contents of the car, and then have the car towed. Accordingly, Entrekin called for a second police officer, Joey Zeibach, to conduct an inventory search of Blackburn's car while Entrekin issued a citation to Blackburn for driving with a suspended license. During the inventory search, Zeibach discovered a roll of approximately 100 pseudoephedrine pills in the Blazer. Entrekin responded by

5

calling Stone, a narcotics investigator.

Stone testified that, after he arrived at the scene of the traffic stop, he told Blackburn that the officers had found pseudoephedrine pills in her car, and that he suspected that these pills were intended to be used in the manufacture of methamphetamine. Blackburn responded that she had no connection to the drug trade, and Stone stated that, he believed her, but that, in order to verify this belief, he "needed to go to her house to look for signs of drug activity." Blackburn agreed that the officers could come to her house. Stone stated to Blackburn that, at that point, "she was only being detained for investigation." Stone also told her that she would need to sign a form in order "to protect her rights and [Stone's] rights too when it went to court," and that he would explain this form to her once they arrived at her house. Stone explained that he and Entrekin permitted Blackburn to drive her car to her home, because her house was only a short distance away from the site of the traffic stop.

Stone further testified that, after Blackburn and the officers arrived at Blackburn's house and exited their cars, Blackburn began to cry. Stone told Blackburn that he "wanted her to cooperate," but that the officers would leave if she asked them to do so. Stone also told Blackburn, however, that if the officers left, she would still be detained, and they would apply for a search warrant for her

house.  Blackburn responded by calming down, and agreeing that the officers could enter her house to review the consent form.  Blackburn then used her key to open the door to her house and allow the officers inside.  Stone and Blackburn then sat on a couch, where Stone reviewed the consent form with Blackburn while the other officers executed a protective sweep.[2]  Stone read the form aloud to Blackburn, and underlined the following statements on the form: "I do not have to consent to the search"; "I have the right to deny consent, knowing and understanding that I do not have to"; and "I [consent] voluntarily."  Blackburn appeared to understand the form, and she signed the form.  The parties do not dispute that approximately one-and-a-half hours elapsed between the time of the traffic stop and the time that Blackburn signed the consent form, and that Blackburn signed the form at 1:11 a.m. on May 23, 2007.

Stone also testified that, after Blackburn signed the consent form, the officers who had conducted the protective sweep told Stone that they had observed marijuana on a living room table, and that one of the rooms in the house was locked.  Blackburn informed the officers that the marijuana did not belong to her, and that she did not wish to go to jail due to the marijuana.  Stone told Blackburn

---

[2] Entrekin testified that he, Zeibach, and another officer conducted the protective sweep while Stone reviewed the consent form with Blackburn.  Thereafter, Entrekin, Stone, and Zeibach remained inside the house, while the fourth officer waited outside of Blackburn's house.

that, while he was not concerned about the marijuana, he was concerned about the room that was locked from the outside. Blackburn told the officers that she and her boyfriend shared the locked room, and she used a key to unlock the door and allow the officers inside.

Stone, Entrekin, and Blackburn entered the bedroom, where the officers observed, in plain view, a digital scale and crystal methamphetamine. In addition, the officers observed a gas torch, and additional drug paraphernalia. Under the mattress, Stone discovered a document listing various numbers and figures. After the search of Blackburn's house had ended, Stone and Entrekin observed Sullivan pull into the driveway, and they subsequently found drug paraphernalia in Sullivan's van.

After the conclusion of Stone's testimony, the court found that Entrekin's and Stone's testimony was credible.

The court entered an order granting Blackburn's motion in part, and denying the motion in part. The court first determined that Entrekin's traffic stop was not supported by reasonable suspicion. The court found that Entrekin subjectively had believed that Blackburn's U-turn was suspicious, and that he reasonably had drawn on his own experience to conclude that the U-turn constituted evasive behavior. The court reasoned, however, that evasive behavior, standing by itself, does not

8

justify a stop. Accordingly, the court granted Blackburn's motion to the extent that it sought suppression of the pills seized from her car.

The court next found that the evidence seized from Blackburn's house did not constitute the fruit of the illegal traffic stop, because an intervening circumstance—Blackburn's consent—broke the causal connection between the illegal stop and the seizure of evidence from Blackburn's house. In this regard, the court specifically made the following factual findings: (1) Stone explained to Blackburn that she was not under arrest, and could refuse consent to search her house; (2) Blackburn orally consented to the search of her house; (3) Blackburn signed a consent form; and (4) Blackburn specifically consented to the officers' search of her bedroom by opening the door with a key. Accordingly, the court found that Blackburn voluntarily had consented to a search of her house several times.

In analyzing the causal connection between the traffic stop and the search of Blackburn's house, the court determined that Entrekin had not engaged in "flagrant" misconduct by stopping Blackburn. The court also found that attenuating circumstances occurred when the officers permitted Blackburn to drive to her house, and then gave her the opportunity to withdraw her consent. In addition, the court found that approximately one-and-a-half hours elapsed between

the traffic stop and Blackburn's consent, which was "appreciable time for Blackburn to reflect on her decision to give consent." As a result, the court concluded that the items seized from Blackburn's bedroom were not the fruits of the illegal traffic stop, and denied Blackburn's motion to the extent it sought the suppression of these items.

Blackburn and Sullivan proceeded to a joint trial by jury. During the trial, Stone testified that he had worked for the MPD's narcotics investigation unit for three years. Stone identified the items that he and Entrekin found in Blackburn's bedroom, including the gas torch, the digital scale, the crystal methamphetamine, and the piece of paper recovered from underneath Blackburn's mattress, which had the figure "1700" written on it. Stone explained that, based on his experience as a narcotics officer, he recognized the torch as an item commonly used to manufacture methamphetamine. Stone further explained that the presence of crystal methamphetamine indicated to him that an individual had a source who supplied him with large amounts of methamphetamine. Stone also testified that, in his experience, the presence of a digital scale indicated drug trafficking, and not mere drug use. In addition, Stone testified that he believed that a price of $1,700 could correspond to a drug transaction for cocaine or methamphetamine.

The court overruled Blackburn's and Sullivan's motions to strike Stone's

10

opinions regarding the torch, the crystal methamphetamine, the digital scales, and the significance of the "1700" figure, as improper opinion testimony. Thereafter, Stone testified that his experience as a narcotics officer included interviewing individuals involved with manufacturing and distributing methamphetamine. In addition, he had participated in investigations, in an undercover capacity, as a buyer of methamphetamine, and had received training in the processes by which methamphetamine is manufactured. Although Stone provided this testimony regarding his specialized experience as a narcotics officer, the government did not expressly request that the court admit Stone's testimony as expert testimony.

Stone further testified that, during his encounter with Blackburn, Blackburn had informed him and other officers that she shared her bedroom with her boyfriend. Stone testified that, after the officers arrested Blackburn, Sullivan, who was driving a van, pulled into Blackburn's driveway. During a subsequent search of Sullivan's van, Stone discovered drug paraphernalia, digital scales, cocaine, methamphetamine, and crystal methamphetamine. Stone also found plastic tubing in the van, and testified that, in his experience as a narcotics officer, he had learned that plastic tubing was used to manufacture methamphetamine. Stone also discovered numerous small, plastic bags in Sullivan's van, some of which were empty, and some of which contained narcotics. In his experience, Stone had

11

learned that such bags were used to package narcotics for sale.

After the completion of Stone's testimony, several witnesses, including Stacey Dewayne Merritt, Xaysana, Adams, Nelson Oxner, and Christopher Michael Long, testified that they had conducted methamphetamine transactions with both Blackburn and Sullivan. Merritt, Xaysana, Adams, and Long all testified that they had met with Blackburn and Sullivan at a trailer on Ramsey Road to conduct methamphetamine transactions. Adams had also met with Blackburn and Sullivan at a Motel 6 location at "Tillman's Corner."

Merritt also testified that, over the course of his dealings with Blackburn and Sullivan, they had exchanged drug quantities that, together, had a value of approximately $40,000. He conceded that, during an interview with a police officer, he had not been able to identify Sullivan in a photographic line-up.

Xaysana testified that he had been introduced to Blackburn and Sullivan by a mutual friend, Oxner. Initially, Oxner had purchased drugs from Xaysana, and then provided the drugs to Blackburn and Sullivan. Eventually, however, Xaysana began to sell methamphetamine directly to Blackburn and Sullivan. Xaysana's drug-trafficking records reflected that, during an approximate two-month period, he sold amounts of methamphetamine to Blackburn and Sullivan that ranged between one-half of an ounce to three ounces, and at prices that ranged between

12

$2,200 and $6,000. On cross-examination, Xaysana admitted that, during the previous 13 months, he had been incarcerated at the same prison as other government witnesses in the present case.

Adams testified that he met Blackburn and Sullivan in 2006, and that the three agreed that Blackburn and Sullivan would sell methamphetamine for Adams. Thereafter, Adams began visiting Blackburn and Sullivan's trailer, and typically would bring an ounce of methamphetamine with him. After Adams arrived, either Blackburn or Sullivan would leave to sell the methamphetamine, and the other would remain at the trailer with Adams. While he was in prison, Adams spoke with Xaysana and another prisoner, Danny Lee, and the three discussed the individuals with whom they had bought and sold drugs. Accordingly, the three realized that they had all conducted drug transactions with Blackburn and Sullivan. When Adams learned that police officers had contacted Xaysana and Lee to ask them about Blackburn and Sullivan, Adams wrote a letter to a police officer, Joseph Wolfe, to inform Wolfe that he also could provide information about Blackburn and Sullivan.

Oxner testified that, on numerous occasions, he had obtained methamphetamine from Xaysana, and, in turn, had sold the methamphetamine to Blackburn and Sullivan. Eventually, Xaysana asked Oxner to introduce him to

Blackburn and Sullivan because they were "moving a lot of methamphetamine." Xaysana subsequently met with Blackburn and Sullivan to discuss prospective methamphetamine transactions, and, thereafter, Xaysana sold methamphetamine directly to Blackburn and Sullivan. Oxner also had purchased drugs from Blackburn on several occasions. While Oxner primarily dealt with Blackburn on these occasions, Sullivan would be present. Oxner also stated, "[Blackburn] would always talk to [Sullivan], you know. [Blackburn] was doing something and like, say, going to sell something to somebody, [and] she would always make sure it was all right with [Sullivan]."

Long testified that, during 2007, he had purchased methamphetamine from Blackburn and Sullivan approximately once every one or two weeks. On cross-examination, Long testified that he had been unable to identify Sullivan from a photographic line-up, despite the fact that he had used drugs or conducted drug transactions with Blackburn and Sullivan on approximately 30 to 40 occasions.

Merritt, Xaysana, Adams, Oxner, and Long each had pled guilty to federal drug charges, and, each witness, as part of his plea agreement, had agreed to provide substantial assistance to the government in exchange for the government's recommendation that he receive a sentence reduction. These plea agreements were admitted into evidence. Each of these witnesses admitted that he hoped to provide

such substantial assistance by testifying in the present case.

Wolfe testified that he was employed by the MPD as a Drug Enforcement Administration task force officer, and had participated in the investigation of Blackburn and Sullivan. Wolfe had shown photographic line-ups of individuals to Xaysana, and Xaysana had identified both Blackburn and Sullivan out of the line-ups. Adams and Oxner also were able to identify both Blackburn and Sullivan from photographic line-ups. When Wolfe interviewed Adams in February 2008, Adams provided Wolfe with a list of names of individuals involved in drug trafficking. This list included an individual named "Tasha Newton."

As a result of his interview with Adams, Wolfe reviewed records from the Motel 6 location at Tillman's corner, and discovered that Blackburn and Sullivan had rented a room at that location. Wolfe reviewed telephone records associated with the telephone numbers used by Blackburn, Merritt, Xaysana, and Oxner. In reviewing these records, Wolfe confirmed the following: (1) between May 21, 2007, and July 31, 2007, Blackburn called Merritt 512 times, and Merritt called Blackburn 52 times; between July 25, 2007, and September 20, 2007, Blackburn called Xaysana 4 times, and Xaysana called Blackburn 3 times; and (3) between August 1, 2007, and September 25, 2007, Blackburn called Oxner 66 times, and Oxner called Blackburn 42 times. The majority of all of these telephone calls

15

lasted for approximately one or two minutes.

On cross-examination, Wolfe admitted that Lee had not been able to identify Sullivan out of a photographic line-up. He confirmed that Sullivan's name was not included on the list of individuals that Adams had provided to him in February 2008. One month after the grand jury issued its July 2008 indictment against Blackburn and Sullivan, however, Adams had written a letter to Wolfe, stating that he had information about both Sullivan and Blackburn.

Sullivan moved for a judgment of acquittal as to Count 1, asserting that the government had failed to prove the existence of an agreement between himself and Blackburn. Sullivan also moved for judgment of acquittal as to Counts 3 and 4, asserting that the government had failed to demonstrate that he intended to distribute narcotics. The court denied these motions.

The jury found both Blackburn and Sullivan guilty as to Count 1, and found Sullivan guilty as to Counts 3 and 4. The court sentenced Blackburn and Sullivan each to terms of 300 months' imprisonment.

## II.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000) (quotation omitted). In this context, we review the district court's factual findings

16

for clear error, and construe the facts "in the light most favorable to the party that prevailed in the district court." *Id.* (quotation omitted). We review *de novo* the district court's application of the law to the facts. *Id.*

Where an individual's consent to a search follows illegal activity by the police, we conduct a two-step inquiry to determine whether the exclusionary rule should apply to bar the admission of evidence found pursuant to the individual's consent. *United States v. Delancy*, 502 F.3d 1297, 1308 (11th Cir. 2007). "First, a court must determine whether the consent was voluntary." *Id.* "Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the fruit of the poisonous tree." *Id.* (quotation omitted). The second element of this analysis does not focus on "but for" causation, but "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 1308-09 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)).

In determining whether an individual's consent was "tainted" by a preceding illegal search or seizure, we conduct a "fact-specific" inquiry, considering the following non-exhaustive list of factors: (1) temporal proximity; (2) intervening

17

circumstances; and (3) the purpose and flagrancy of the government's conduct. *Delancy*, 502 F.3d at 1309-12.

The first factor—temporal proximity—focuses on "the time elapsed between the illegal act and a subject's consent to search." *Delancy*, 502 F.3d at 1310. "There is no bright-line rule defining the temporal factor." *Id.* If the period of elapsed time is "extremely short," then this factor weighs in favor of exclusion. *Id.* In contrast, "a longer interval obviously weighs in favor of admissibility." *Id.* In evaluating temporal proximity, a court should consider the "character" of the interaction between the consenting individual and the police officers, considering whether the interaction was conversational, or threatening. *See id.* at 1311 (holding that, although only 15 minutes elapsed between the allegedly illegal police action and the subject's consent, the interaction between the consenting individual and the officers was "conversational" and non-threatening, and thus, on the facts of that particular case, "timing [was] not the most important factor").

The second factor—intervening circumstances—focuses on whether any circumstances or events "interrupt[ed] the causal connection between the illegal act and the possibly tainted consent." *Delancy*, 502 F.3d at 1311. An individual's review and signing of a consent form, which clearly states that she had the right to refuse consent, may constitute "an important intervening circumstance." *Id.*

18

In addressing the final factor—the purpose and flagrancy of the officers' conduct—we have considered whether: (1) the preceding illegal police activity was taken "with the express purpose of exploiting [the] illegal action"; (2) the search was limited or broad in its scope; and (3) officers used illegally seized evidence to obtain consent. *See Delancy*, 502 F.3d at 1312-13; *United States v. Lopez-Garcia*, 565 F.3d 1306, 1316 (11th Cir.), *cert. denied*, 130 S.Ct. 1012 (2009).

Blackburn concedes that her consent was voluntary, and, as a result, we focus on the causal connection between Entrekin's illegal traffic stop and Blackburn's consent for the officers to search her home. As for the first factor—temporal proximity—it is undisputed that approximately one-and-a-half hours elapsed between Entrekin's traffic stop and the time that Blackburn signed the consent form. Because there is no bright-line rule stating what amount of time weighs in favor of admission or exclusion, we examine the character of the interaction between Blackburn and the police officers.

There is no evidence that the police officers threatened Blackburn, pointed weapons at her, or handcuffed her. Stone explained to Blackburn that she was not under arrest, and informed her that she had the right to refuse consent. Moreover, Stone testified that he asked for Blackburn's consent to search her home once at the traffic stop, once outside her home, and a third time when reviewing the

19

consent form. In addition, while Blackburn may not have been free to leave when she drove her car to her house, the fact that she was able to drive her own car to her home demonstrates that she retained appreciable freedom of movement. Based on these facts, it appears that the interaction between the police officers and Blackburn was non-threatening, and relatively conversational. Moreover, because Stone asked for Blackburn's consent on three separate occasions, Blackburn had the opportunity to reflect upon and change her answer before signing the consent form. Accordingly, we conclude that temporal proximity is not the most important factor in this case. *See Delancy*, 502 F.3d at 1311.

Next, at least one significant attenuating event occurred between the traffic stop and Blackburn's signing of the consent form—Stone's review of the consent form with Blackburn, during which he underlined portions of the form that stated that Blackburn had the right to refuse consent. *See Delancy*, 502 F.3d at 1311-12. This showed that, at the time that Blackburn signed the consent form and allowed the officers into her bedroom, she was aware of her rights under the Fourth Amendment.

Finally, although Entrekin's traffic stop may not have been supported by reasonable suspicion, there is no evidence that the officers acted flagrantly. *See Delancy*, 502 F.3d at 1309. There is no evidence that Entrekin stopped Blackburn

20

with the ulterior motive of coercing her into giving consent to search her home, or conducting a general, exploratory search. There is no evidence that the searches of Blackburn's car or home were overly broad. *See id.* at 1312-13. As discussed above, the evidence also shows that the officers did not threaten Blackburn. In addition, although the discovery of the pseudoephedrine pills prompted Stone to ask Blackburn for permission to search her house, it does not appear that he exploited this evidence to obtain Blackburn's consent, as he repeatedly informed Blackburn that she could refuse consent.

Accordingly, the three factors discussed above weigh in favor of admission of the evidence found in Blackburn's bedroom. *See Delancy*, 502 F.3d at 1309-12, 1314. Although the officers would not have searched Blackburn's home but for Entrekin's illegal traffic stop, the relevant analysis does not focus on "but for" causation. *See id.*, 502 F.3d at 1309. Rather, because Blackburn had several opportunities to refuse consent, had been informed of her Fourth Amendment rights before the officers searched her bedroom, and was not subjected to flagrant police conduct, her consent was not tainted by the illegal traffic stop, and the district court did not err in denying her motion to suppress the evidence found in her bedroom. *See id.* at 1309-12, 1314.

**III.**

"We review challenges to the sufficiency of the evidence *de novo*." *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008). "We view the evidence in the light most favorable to the government and all reasonable inferences . . . in the government's favor." *Id.* In addition, "[b]ecause credibility determinations are the exclusive province of the fact finder, we cannot disregard the jury's credibility determination unless it is unbelievable on its face." *United States v. Garcia*, 405 F.3d 1260, 1270 (11th Cir. 2005) (quotation omitted). We must decide whether a reasonable fact finder "could have found the defendant guilty beyond a reasonable doubt." *Mercer*, 541 F.3d at 1074.

Pursuant to 21 U.S.C. §§ 841(a)(1) and 846, it is illegal for an individual to conspire to possess with intent to distribute methamphetamine. *See* 21 U.S.C. §§ 841(a)(1) and 846. "To support a conspiracy conviction, the government must prove (1) an agreement between the defendant and one or more persons, (2) the object of which is to do . . . an unlawful act." *United States v. Smith*, 289 F.3d 696, 706 (11th Cir. 2002) (quotation omitted). "To prove participation in a conspiracy, the government must [prove] . . . that a conspiracy existed and that the defendant knowingly and voluntarily joined the conspiracy." *Garcia*, 405 F.3d at 1269. "[T]he government need not prove that the defendants knew all of the detail[s] or

22

participated in every aspect of the conspiracy." *Id.* at 1270. "Rather, the government must only prove that the defendant[] knew the essential nature of the conspiracy." *Id.* (quotation omitted). Although the defendant's presence at the scene of a crime, standing alone, is insufficient to support a conspiracy conviction, his presence is probative of whether he participated in the charged conspiracy. *United States v. McDowell*, 250 F.3d 1354, 1365 (11th Cir. 2001).

"To convict a defendant of possession with intent to distribute controlled substances, the [g]overnment must prove that he or she possessed drugs with the intent to distribute them." *United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005). "The government may prove each of these elements with direct or circumstantial evidence." *Id.* (quotation omitted). The evidence may be sufficient to support a defendant's convictions for possession with intent to distribute narcotics where the evidence shows that the defendant joined in a drug-trafficking conspiracy, and was in the presence of large quantities of narcotics. *See Miranda*, 425 F.3d at 955, 961-62.

Here, the jury heard testimony regarding the witnesses' plea agreements with the government, and the relevant plea agreements were entered into evidence. Moreover, the jury heard evidence regarding the timing and circumstances under which Xaysana and Adams provided information regarding Blackburn and

23

Sullivan to police officers.  In addition, the jury heard evidence that Merritt and Long could not identify Sullivan out of a photographic line-up. Accordingly, the jury was armed with all of the evidence emphasized by Sullivan on appeal when it made credibility determinations, and the jury's decision to credit the testimony of the cooperating government witnesses is not "unbelievable on its face." *See Garcia*, 405 F.3d at 1270.  Significantly, several witnesses testified that they had met with Blackburn and Sullivan on Ramsey Road.  Xaysana and Oxner testified consistently with each other that Oxner had introduced Xaysana to Blackburn and Sullivan, and that Xaysana subsequently began to directly deal with Blackburn and Sullivan.  In addition, many of the witnesses' testimony, that they had met with Blackburn and Sullivan to deal drugs, was corroborated by hotel records and telephone records.  Several witnesses were able to identify both Blackburn and Sullivan from photographic line-ups.

Based on the testimony described above, there was sufficient evidence for a reasonable jury to conclude that a conspiracy to buy and sell methamphetamine existed, and that Sullivan had joined in that conspiracy. *See* 21 U.S.C. §§ 841(a)(1) and 846; *Garcia*, 405 F.3d at 1269-70.  The witnesses testified that Sullivan was present during numerous methamphetamine transactions. *See McDowell*, 250 F.3d at 1365.  Importantly, Xaysana testified that he had conducted

24

methamphetamine transactions with Sullivan, and Adams testified that Blackburn and Sullivan worked together to sell methamphetamine. Oxner testified that Blackburn would ask for Sullivan's approval before she conducted drug transactions. Based on this testimony, the jury could reasonably conclude that Sullivan knew of the essential nature of the conspiracy, and had participated in the conspiracy. *See Garcia*, 405 F.3d at 1269-70. Accordingly, sufficient evidence supports Sullivan's conviction as to Count 1.

Sufficient evidence also supports Sullivan's convictions as to Counts 3 and 4. As noted above, the evidence showed that Sullivan joined in a conspiracy to buy and sell methamphetamine. *See Miranda*, 425 F.3d at 961-62. The witnesses' testimony showed that Sullivan frequently was in the presence of large amounts of methamphetamine, as they testified that a single transaction with Blackburn and Sullivan could involve thousands of dollars, or an ounce or more of methamphetamine. *See id*. Moreover, Stone testified that he found both cocaine and methamphetamine in Sullivan's van, in close proximity to items typically associated with distributing drugs and manufacturing methamphetamine, including digital scales, baggies, and plastic tubing. Sullivan does not contest that the amounts of cocaine and methamphetamine discovered in his van were equal to 31 grams of methamphetamine and 23 grams of cocaine, or approximately one ounce

25

of each substance.[3]  All of this evidence was sufficient to support Sullivan's

convictions as to Counts 3 and 4.  *See Miranda*, 425 F.3d at 959, 961-62.

**IV.**

"We review the district court's decisions regarding the admissibility of

expert testimony for abuse of discretion."  *United States v. Emmanuel*, 565 F.3d

1324, 1335 (11th Cir.), *cert. denied*, 130 S.Ct. 1032 (2009).  Where a defendant

fails to raise an evidentiary objection before the district court, however, and seeks

to raise the argument for the first time on appeal, we apply plain-error review.  *See

id.* at 1333.  "To demonstrate plain error, there must be an (1) error (2) that is plain

and (3) that affects substantial rights."  *Id.* (quotation omitted).

Pursuant to Fed.R.Evid. 701, "If the witness is not testifying as an expert,

the witness' testimony in the form of opinions or inferences is limited to those

opinions or inferences which are . . . not based on scientific, technical, or other

specialized knowledge within the scope of Rule 702."  Fed.R.Evid. 701(c).

Pursuant to Fed.R.Evid. 702:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion or
> otherwise, if (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and methods,

---

[3] One ounce is equal to approximately 28.35 grams.

26

and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

"The rule is well-established that an experienced narcotics agent may testify about the significance of certain conduct or methods of operation unique to the drug distribution business." *United States v. Butler*, 102 F.3d 1191, 1199 (11th Cir. 1997). Under Rule 702, experienced government agents may provide testimony regarding general techniques used by drug traffickers, or the meaning of certain jargon used in the drug-trafficking business. *See United States v. Chastain*, 198 F.3d 1338, 1348-49 (11th Cir. 1999) (court did not abuse its discretion by permitting a U.S. customs agent, who had ten years' experience in investigating drug smuggling and had received training in the area of drug smuggling with the use of airplanes, to provide expert testimony about general techniques used by drug traffickers who use airplanes to smuggle drugs). Nevertheless, such opinion testimony is improper where a case agent goes beyond providing information about methods unique to the drug business and "summarizes his beliefs about the defendant's conduct based upon his knowledge of the case." *Emmanuel*, 565 F.3d at 1335 (quotation omitted). Even if a district court errs by admitting opinion testimony, however, such a non-constitutional error will not warrant reversal of the defendant's conviction "where [the] error had no substantial influence on the

27

outcome, and sufficient evidence uninfected by error supports the verdict." *Id.* (quotation omitted).

"[I]t is error to admit [the] opinion testimony of lay witnesses based on specialized knowledge," and a party may not evade the requirements for expert testimony, set forth in Rule 702, by proffering an expert witness as if he were a lay witness. *United States v. Dulcio*, 441 F.3d 1269, 1275 (11th Cir. 2006). Such an error, however, is also subject to the harmless-error test described above. *See id.*

Here, Stone's opinions as to the significance of the torch, digital scales, crystal methamphetamine, and "1700" figure were based on his specialized experience as a narcotics officer, and, as a result, his testimony in this regard constituted expert testimony. *See* Fed.R.Evid 702; *Butler*, 102 F.3d at 1199. To the extent that Blackburn and Sullivan argue that Stone was not qualified to give an expert opinion regarding the significance of certain items in the methamphetamine trade, we review this argument only for plain error, because they did not raise this objection to the district court. *Emmanuel*, 565 F.3d at 1333. In this regard, there was no error, let alone plain error, as Stone testified that he had received training in the methods by which methamphetamine is manufactured, and had investigated narcotics crimes for three years. *See Chastain*, 198 F.3d at 1348-49.

Moreover, most of Stone's opinion testimony did not invade the fact-finding

province of the jury. *See Emmanuel*, 565 F.3d at 1335. Stone's opinions regarding the gas torch, the crystal methamphetamine, and the digital scales were limited to generalizations based on what he had learned as a narcotics officer, and did not include an opinion as to how Blackburn or Sullivan used certain items. Accordingly, the court did not abuse its discretion in denying Blackburn's and Sullivan's motions to strike this testimony on the ground that it invaded the province of the jury, or amounted to improper speculation. *See Emmanuel*, 565 F.3d at 1335; Fed.R.Evid. 702. While Stone's opinion regarding the significance of the "1700" figure did not bear as clear of a connection to his experience as a narcotics officer, any error that the court made in admitting this testimony was harmless in light of the substantial evidence of Blackburn's and Sullivan's guilt, which is described above. *See Emmanuel*, 565 F.3d at 1335.

Sullivan's and Blackburn's alternative argument—that the government improperly presented Stone's opinions as those of a lay witness—also lacks merit. Because Sullivan and Blackburn did not raise this objection to the district court, it is subject to plain error review. *See Emmanuel*, 565 F.3d at 1333. Sullivan and Blackburn cannot satisfy the plain-error standard because, even if Stone's opinions were improperly presented as those of a lay witness, the error was harmless in light of testimony from numerous witnesses that they had conducted methamphetamine

29

transactions with both Blackburn and Sullivan, and the fact that nearly one ounce each of methamphetamine and cocaine were discovered in Sullivan's van. *See id.* at 1333, 1335.

For the foregoing reasons, we affirm Blackburn's and Sullivan's convictions.

**AFFIRMED.**