**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-10300

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

WILLIAM MICHAEL SPEARMAN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:22-cr-80173-AMC-2

_____

Before ROSENBAUM, BRANCH, and KIDD, Circuit Judges.

BRANCH, Circuit Judge:

William Spearman was the lead administrator of an enormous network of child pornography orchestrated through a dark-web site referred to as "Website A." After the FBI received a tip from a foreign law enforcement agency ("FLEA") that an IP

address associated with the site was associated with Spearman's address in Alabama, agents obtained a warrant to search his home and subsequently found incriminating evidence. Spearman moved to suppress all evidence obtained in the search. The district court denied his motion without an evidentiary hearing, and Spearman pleaded guilty to one count of engaging in a child exploitation enterprise, in violation of 18 U.S.C. § 2252A(g).[1] He was sentenced to life in prison.

On appeal, Spearman challenges the district court's failure to hold an evidentiary hearing on his motion to suppress. He argues that he alleged facts that, if proven, would have shown enough "substantial participation" by the FBI in the FLEA's search leading to the discovery of his IP address that a "joint venture" between the agencies occurred. He further argues that such a "joint venture" would implicate the Fourth Amendment because the FBI would have needed a warrant to obtain his IP address on its own. Spearman also challenges his sentence, arguing the district court failed to properly account for his "extraordinary mitigating factors."

The problem for Spearman's suppression argument is that while he alleged some cooperation and technology sharing between the FBI and the FLEA, he failed to allege such

---

[1] In exchange for his plea, the government agreed to dismiss two separate counts against Spearman: conspiring to advertise child pornography, in violation of 18 U.S.C. § 2251(d) and (e); and conspiring to distribute child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1).

participation by the FBI that we must consider the FLEA's actions as if they were taken by the FBI itself. And because such participation is a necessary element for subjecting a foreign search to Fourth Amendment scrutiny, the district court was not required to hold a hearing before denying Spearman's motion. Likewise, the record confirms that the district court considered Spearman's mitigating circumstances, and the government presented ample evidence of the depth and depravity of Spearman's crimes, such that the district court did not abuse its discretion in sentencing him to life in prison. We therefore affirm on both counts.

## I.    Background

In this section, we recount the facts relevant to Spearman's challenges to the district court's failure to hold an evidentiary hearing and to his life sentence. The facts recounted herein focus on the disputes central to those two challenges and do not recount the disturbing details of Spearman's crimes in full.

### A.    Spearman controls an online network profiting off child pornography

The events leading to Spearman's conviction begin with Spearman's involvement with a dark web internet domain referred to only as "Website A." "The [d]ark [w]eb is a general term that describes hidden Internet sites that users cannot access without using special software." *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 302 n.4 (2d Cir. 2021) (quotations omitted). These restrictions on access make it the home of many criminals and

"other malicious actors" who utilize those restrictions to attempt to shield their actions from the view of law enforcement. *Id.*

Spearman eventually became the lead administrator of Website A, which housed many such criminals and "malicious actors." *Id.* In order to exist on the dark web and maintain anonymity, Website A operated over the Tor network. The Tor network allows users to operate or access websites available only to users within the network. It also uses technology that masks the internet protocol ("IP") address of users. This masking ostensibly allows users to operate anonymously without the fear that others, including law enforcement, will be able to discover their identity.

Website A's main purpose was to provide access to child pornography, though it did not directly host child pornography on its servers. Instead, it maintained a series of chat rooms in which users could exchange child pornography by posting URL links that redirected to another Tor network website where child pornography was displayed or available for download. To better facilitate the sharing of child pornography, Website A contained a guide on how to share child pornography through links. When users posted the links, they used "tags" with words or phrases to describe the category of child pornography they were sharing. The tags used included an "age" tag specifying if the content involved babies, toddlers, or preteens; a "gender" tag specifying whether the content involved boys, girls, or both; an "activity" tag describing the type of sexual activity involved; and, for some content, an

"extreme" tag specifying if the video involved "torture," "rape," "crying," or "strangulation."

Website A took various measures to reward and encourage users who were deeply involved in child pornography. New users of Website A were restricted to one chat room called the Website A "Gateway." The Gateway's description stated that guests who participated by chatting and sharing child pornography could be invited to other Website A rooms as "members." Users who were promoted to "member" and beyond could access other rooms, including, for example, "Aphrodite's Playground" (which encouraged users to post pornographic content of children between ages 5 and 15, but prohibited extreme content), "Tots-R-Us" (which encouraged users to post pornographic content of children 5 years and younger, but prohibited extreme content), "The Library" (which was a repository of links to child pornography without chat and which was limited to members who had contributed significantly to the website), and a "No-Limits Chat" (which was dedicated to "extreme topics" such as "Death, Gore, BDSM, Hurtcore, Bestiality, [and] Scat").

Spearman's role in Website A started as a baseline user but grew over time.[2] In his initial posts, he included links to hardcore child pornography. These posts allowed him increased access to the website, and over time, he rose through its ranks to become its lead administrator. As the lead administrator of Website A,

---

[2] He eventually stopped posting child pornography once his leadership status gave him access to the various chat rooms on the site.

Spearman supervised and directed other Website A staff, helped clean up and organize links to child pornography on the website, ensured staff were present at all times in different sections of Website A, presided over staff meetings, promoted and demoted users and staff, and oversaw the day-to-day organization and maintenance of Website A.   Spearman used the username "N****1" which he later changed to "K****,"[3] and other high-ranking Website A users referred to Spearman as "boss."  Hundreds of thousands of images or videos of child pornography were accessible and distributed throughout Website A.

### B.    The FBI Investigation into Spearman

The FBI began investigating Website A in 2020, but at first had very little success.  Then, in June 2022, according to internal FBI documents, the FBI's Child Exploitation Operational Unit ("CEOU") "executed an operation that allowed CEOU to conduct offensive technical operations which eventually led to the identification of an IP address for who CEOU believes is 'N****1.'" Details regarding what exactly occurred during that investigation are sparse, and no arrest was made involving Spearman at that time.[4]  Instead, at around the same time (on June 30, 2022), the FBI

---

[3] The usernames Spearman used have been redacted by the parties' public filings and are not a matter of public record.

[4] Notably, the N****1 username was inactive at this time and was thus not actively being used by Spearman, who had transitioned to the K**** username, and there is no indication in the record that the FBI knew at this time who the N****1 username was connected to.  The inactivity of the N****1 username may help explain the FBI's apparent confusion regarding

24-10300                Opinion of the Court                7

executed multiple search warrants regarding the website's second-in-command, Selwyn Rosenstein (username "Tony"), who was subsequently arrested.

The arrest of Rosenstein allowed the FBI to access his account, including its ability to message other members of Website A, providing the FBI with new tools as it continued its investigation of Website A. Through Rosenstein's account, the FBI began interacting with members of Website A and attempting to discover the identities of other users. One of the tools the FBI deployed included sending "target files" with "offensive code" to other users of Website A.[5] When users downloaded the files, the offensive

---

whose IP address it had obtained in June of 2022, as the IP address it obtained in June of 2022 did not belong to Spearman and was thus not the IP address of N****1, despite its original "belie[f]."

[5] The FBI obtained several warrants prior to using them against various Website A users. However, despite allegedly having a warrant to execute this same operation for the username K****, the FBI claims it never executed the warrant. And indeed, such a warrant is not in the record. The FBI mentions it for the first time in its brief on appeal. The reason for this absence in the record, the FBI claims, is that Spearman did not allege below that the FBI gave the FLEA access to Website A's servers and directed the FLEA to search his computer using a remote-access technique, so there was no need to produce a warrant showing the FBI would not have needed the FLEA's help to do so. This may be true. However, for purposes of this appeal, given the warrant is not in the record, we assume, as Spearman alleges, that such a warrant does not exist.

code caused the user's computer to contact an FBI server and convey to it the user's IP address.

According to the FBI, its focus on Spearman began not with the June 2022 offensive operation, but from tips provided by a foreign law enforcement agency. On August 17, 2022, the FBI received two tips from a FLEA stating that, on August 14, 2022, the user of a specified IP address in the United States "was involved in the management" of Website A. The FLEA advised that it had "lawfully acquired" this information, though it did not disclose how it did so or provide any other information about its investigation. According to the FBI, these tips eventually led to the identification of Spearman's home address. Once it received these tips, the FBI served an administrative subpoena on the internet service provider connected with Spearman's IP address. The internet provider traced the IP address to Spearman's physical address in Alabama.

Now armed with Spearman's home address (and his identity as the registered owner of that physical address), the FBI was prepared to move on Spearman. It took its findings to a magistrate judge and applied for a no-knock warrant in November 2022 to arrest Spearman and search his home. The warrant application did not mention or discuss any "offensive operations" by the FBI itself. Instead, the application focused exclusively on the tip provided by the FLEA and the information gained from Spearman's internet provider. The FBI received the warrant.

That same month, FBI agents executed the warrant at Spearman's home.  After entering his home, FBI agents encountered and arrested Spearman.  FBI agents also recovered several devices from Spearman's garage which contained 19,422 images or videos of child pornography.  This material included images and videos of older children being instructed to abuse toddlers, and of adults engaging in the sexual torture of physically restrained toddlers.

The agents also interviewed Spearman, who told the agents that he used the names "N****1" and "K****" on Website A.  He also told them that he was one of the four main administrators of Website A, that he began accessing it in early 2018, that he was an administrator of another child pornography website on the Tor network, and that he maintained a large collection of child pornography at his home.

C.     Procedural History

After his arrest and arraignment before the district court, Spearman moved for an evidentiary hearing on his motion to suppress all evidence obtained from the search of his residence and personal devices, as well as his subsequent interview.  He alleged that the FBI violated the Fourth Amendment in obtaining his IP address, such that all the evidence subsequently discovered in the warrant-based searches of his residence and interview were infected by that violation.

Spearman argued that the FBI must have violated the Fourth Amendment because the only way to obtain his Tor-

protected IP address was through "offensive code," possessed by the FBI, which can remotely access a server or computer and instruct it to send back its IP address. But, he alleged, rather than obtaining a warrant to perform such a search, the FBI engaged in a cooperative investigative partnership with the FLEA through which the FLEA obtained and shared Spearman's IP address to the FBI instead. After all, Spearman pointed out, internal FBI documents reported that its *own* offensive technical operations in June 2022 eventually identified an IP address they "believed" was N****1, never mentioning a foreign government, suggesting that the FBI was so actively engaged in the joint operation that it considered it entirely its own.[6] Spearman thus argued that when the FLEA obtained his address, it did so as an "agent" of the FBI. As such, Spearman argued, the FLEA's search that identified his address was an unlawful warrantless search in violation of the Fourth Amendment.

The district court denied the motion to suppress and the request for a hearing. The court emphasized the general rule that the Fourth Amendment does not apply to searches carried out by foreign officials in their own countries. Thus, the court held that Spearman bore the burden to prove the "joint venture" exception to that general rule. The district court held that he failed to meet this burden because the evidence he cited showed no more than

---

[6] As noted above, however, the FBI did mention the FLEA's tips when it applied for the November 2022 warrant.

generalized cooperation and information sharing between the FBI and the FLEA.

The district court likewise concluded that an evidentiary hearing was not required. The district court "credit[ed]" the documents attached to the pleadings—*i.e.*, the warrant application for the search of Spearman's home from November of 2022, the FLEA tip, and the internal FBI reports from June 2022. However, according to the court, Spearman's allegations and inferences from those documents made only "general" and "conclusory" assertions about the relationship between the FBI and the FLEA. The court thus held an evidentiary hearing was unnecessary because there were no evidentiary issues to resolve and denied Spearman's motion to suppress.

### D.    Sentencing

After his motion to suppress was denied, Spearman pleaded guilty. In the presentence investigation report ("PSI"), the probation officer calculated Spearman's total offense level at 43, the maximum offense level. Because of Spearman's lack of previous criminal conduct, the probation officer calculated Spearman's criminal history category as I. Based on Spearman's criminal history category of I and his total offense level of 43, the probation officer determined that the guideline imprisonment range was a life sentence.

### i.    Evidence Presented During Sentencing

At his sentencing hearing, Spearman argued that he merited a downward variance from the guidelines range because of

extraordinary mitigating factors, which were wide-ranging in type and substance. In support of this argument, Spearman provided the following information in an interview with the probation office prior to sentencing.

Spearman was diagnosed with PTSD while in the military in the late-1990s and with depression around 2008. He received treatment for, among other mental conditions, chronic PTSD, memory lapses or loss, primary insomnia, major depressive disorder, generalized anxiety disorder, and attention deficit hyperactivity disorder. Spearman noted that he had three children, including an eight-year-old son with his current wife.

Spearman also pointed to his 22 years of service in the United States Army as a factor for the court to consider in his favor. Spearman received several military decorations, including a Bronze Star Medal, a Meritorious Service Medal, a National Defense Service Medal, a Kuwait Liberation Medal, a Korean Defense Service Medal, a Global War on Terrorism Service Medal, a Master Parachutist Badge with Combat Distinguishing Device, and a Master Parachutist Badge. Spearman also served 3 years, 10 months, and 26 days of foreign deployments, including service in Panama, Saudi Arabia, Qatar, Bahrain, Kuwait, Ecuador, Peru, Antigua and Dominica, and Thailand. Military performance reviews Spearman provided to the court described Spearman as "an invaluable asset to both tactical and strategic intelligence unit commanders," "one of the most innovative officers in the Battalion," "an officer of the highest caliber," "[a] true visionary,"

"one of the Army's finest counterintelligence technicians," "[f]ully ready for the most senior warrant officer positions," and "clearly among the finest Military Intelligence warrant officers in the U.S. Army."

Finally, at the sentencing hearing, Spearman presented the testimony of witnesses of his own, including the expert testimony of forensic psychologist Dr. Amy Swan. Dr. Swan testified that she had conducted a personality assessment inventory of Spearman and concluded that he suffered from a major depressive disorder, a generalized anxiety disorder, and a somatic symptom disorder. Dr. Swan also testified that Spearman "ha[d] one of the most severe cases of [PTSD]" she had ever seen and that it "had resulted in significant impairment in his ability to function on a daily basis." Finally, Dr. Swan testified that Spearman's sexual abuse as a child, ongoing business failures, and deaths within the family, when combined with his PTSD, led Spearman to self-soothe by engaging in irregular sexual conduct. Dr. Swan thus testified that, in her opinion, Spearman's offense stemmed from "a perfect storm of events that caused him to . . . have impaired functioning." Dr. Swan testified that based on her analyses of Spearman, he posed only a 2.4 percent chance of reoffending over the next 5 years.

For its part, the government presented testimony at the sentencing hearing from several witnesses in support of a life sentence. First, the government solicited the testimony of FBI agent David Backlund, who described Spearman as the FBI's most wanted child pornography offender in the world and as the FBI's

"Osama bin Laden from the dark net."  Next, the government presented the testimony of FBI data scientist John-Robert Lee Marsh.  Marsh described the content of some of the pornography recovered from Spearman's devices, including, among other examples, a video in which an 18-month-old female is hung upside down while a woman beats the child and burns her with candle wax, several videos of the sexual torture of children 8 years old or younger, and an image of a topless child with blood across her body who appears to be dead.

### ii.    The District Court's Findings and Sentencing

Before announcing the sentence, the district court said that it had heard "extensive testimony [and] hours of witness presentation" and had read, among other materials, the PSI, Dr. Swan's report, the parties' competing filings, and "the entire record."  The district court stated that it had "made sure to consider it all, given the severity of th[e] case and the government's recommendation of a life sentence," and that it had done so "against the backdrop . . . of the statutory factors in [§] 3553(a)."  The court described the "seriousness of [Spearman's] offense" as "off the charts," citing, among other factors, the "very premise of [Website A] [as] encourag[ing] and incentiviz[ing] other deviant individuals into posting more and more child pornography and to do so with the expectation of rising through the ranks in the website to attain greater privileges."

The district court also addressed Spearman's military service and found that it was not a clear-cut mitigating factor.  The district

court voiced its concerns that it was "almost as if [Spearman] took what [he] learned in the military and then perverted it into this frightening operation." The court also stated that Spearman was a "pedophile" who was, "without a doubt, a danger to society," citing the significant collection of child pornography found in Spearman's home, his use of "concealment tactics and . . . sophisticated knowledge" he acquired in the military to run the website, his operation of other child pornography websites, and Dr. Swan's testimony that Spearman had some interest in children. The court finally found that "[g]eneral deterrence" and the need to "send a clear message that engaging in these underground communities of child exploitation is . . . horrific and will be penalized accordingly" was also an important sentencing factor.

The district court said that it had also considered Spearman's "extensive" mitigation evidence and arguments. The court acknowledged that it was "hard to discount" Spearman's 22 years of military service, but found that Spearman's service did not warrant a variance or departure because of the "unspeakable nature" of Spearman's crimes and because he seemed to use his military experience to operate Website A. Likewise, the court found that while Spearman suffered from severe PTSD, PTSD could not explain his decision to run a website dedicated to the exploitation of children.

The court thus agreed with the recommendation of the probation officer and the government and sentenced Spearman to a guidelines sentence of life imprisonment.

Spearman timely appealed.

## II.    Standard of Review

We review a district court's decision not to hold an evidentiary hearing on a motion to suppress for an abuse of discretion. *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000). We review for plain error any theories supporting a motion to suppress that were not raised below. *United States v. Young*, 350 F.3d 1302, 1305 (11th Cir. 2003).

We also review the substantive reasonableness of a sentence for an abuse of discretion. *United States v. Butler*, 39 F.4th 1349, 1354–55 (11th Cir. 2022).

## III.    Discussion

On appeal, Spearman challenges the district court's failure to hold a suppression hearing, arguing he alleged facts that if proven would have shown a "joint venture" between the FBI and the FLEA such that a warrant to obtain his IP address was required to comply with the Fourth Amendment. Spearman also challenges his sentence, arguing that the district court failed to properly account for his "extraordinary mitigating factors." We disagree and affirm the district court on both counts.

### A.    *The district court did not abuse its discretion in refusing to hold a suppression hearing*

Spearman argues that he was entitled to a suppression hearing because he sufficiently alleged factual issues in his motion to suppress that, if proven, would show that the FBI's collaboration

with the FLEA to obtain his IP address violated the Fourth Amendment.  He raises two arguments in support of this claim. First, he argues that he adequately alleged the FBI had engaged in a joint operation with the FLEA in order to obtain his IP address, thus implicating the FBI in a warrantless search.  Second, Spearman argues (for the first time on appeal) that the FLEA performed a search of his computer on American soil, thereby independently violating the Fourth Amendment.

The government responds that the district court did not err in refusing to hold a suppression hearing.  Regarding Spearman's "joint venture" argument, the government argues that the Fourth Amendment's warrant requirement generally does not apply to searches made by foreign authorities, and that Spearman failed to allege any concrete facts that would suggest FBI involvement was so pervasive that the Fourth Amendment nonetheless applies.  As for Spearman's "any search on American soil" argument, the government points out that Spearman did not raise this issue before the district court, which they argue subjects the argument to plain error review only.  And because no court has embraced this argument before, the government argues Spearman's claims on this ground must also fail on the merits.

We agree with the government and hold that the district court did not abuse its discretion in refusing to hold an evidentiary hearing.

1.    Spearman did not allege facts that, if proven, would show a "joint venture" between the FBI and the FLEA requiring Fourth Amendment scrutiny

Spearman argues that the district court erred in denying his request for an evidentiary hearing on his suppression motion because he alleged sufficient facts that, if proven true, would have shown a "joint venture" between the FBI and the FLEA. In his view, he adequately alleged that the FBI evaded the Fourth Amendment's warrant requirement by directing the FLEA to search Spearman's computer to obtain his Tor-protected IP address. He argues that if it is true that the FBI directed the FLEA to search his computer to obtain his IP address, all of the evidence derived from that IP address should have been suppressed. Thus, he argues, we should remand to the district court to conduct an evidentiary hearing on the veracity of his allegations.

The government disagrees. It argues that the Fourth Amendment's warrant requirement does not apply to searches made by foreign authorities, and that Spearman failed to allege facts showing that the narrow joint-venture exception applied. In the government's view, Spearman's allegations were speculative at best and, even if taken as true, would not require suppression.

Under the Fourth Amendment, the government is prohibited from engaging in "unreasonable searches and seizures" of an individual's person or property. U.S. Const. amend. IV. "Generally, the way to ensure the 'reasonableness' of any search is

24-10300              Opinion of the Court                    19

by securing a warrant." *United States v. Holmes*, 141 F.4th 1183, 1193 (11th Cir. 2025). When a warrantless search is conducted absent any "reasonable" excuse, the evidence obtained must be excluded under the "exclusionary rule." *Murray v. United States*, 487 U.S. 533, 536–37 (1988). Thus, under the exclusionary rule, a defendant who believes evidence has been obtained in violation of the Fourth Amendment may move to exclude the evidence. *See Cooper*, 203 F.3d at 1285.

Upon receiving such a motion to suppress, a district court may elect to hold a hearing. *See id.* But it need not do so in all circumstances. Instead, for a hearing to be required, "the motion must allege facts which, if proven, would provide a basis for relief." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985). A hearing is required only if the motion to suppress alleges facts that "are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *United States v. Smith*, 546 F.2d 1275, 1280 (5th Cir. 1977) (quotation omitted).[7] In other words, the district "court need not act upon general or conclusory assertions founded on mere suspicion or conjecture." *Id.* So to be entitled to a hearing, Spearman needed to specifically and concretely allege plausible, detailed facts that would show a violation of the Fourth Amendment. *Richardson*, 764 F.2d at 1527.

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Our analysis therefore begins with what is required to show a violation of the Fourth Amendment. When the United States receives evidence from a foreign government, "[t]he general rule is that evidence obtained from searches carried out by foreign officials in their own countries is admissible" and does not implicate the Fourth Amendment, much less violate it, for the Fourth Amendment binds only the government of the United States. *United States v. Emmanuel*, 565 F.3d 1324, 1330 (11th Cir. 2009).

This "general rule" is not, however, an absolute rule. When federal officials receive evidence from another sovereign, the Supreme Court has said that such evidence may still be subject to Fourth Amendment scrutiny under what has become known as the "silver platter" doctrine. *Lustig v. United States*, 338 U.S. 74, 78–79 (1949). "The crux of that doctrine is that a search is a search by a federal official if he had a hand in it," but "it is not a search by a federal official if evidence secured by [non-federal] authorities is turned over to the federal authorities on a silver platter." *Id.* We have examined the "silver platter" doctrine in cases where foreign nations provide evidence and have identified two exceptions to the general rule that foreign-obtained evidence does not implicate the Fourth Amendment: (1) when the mechanism of obtaining the evidence "shocks the judicial conscience" and (2) when the exclusionary rule would still have a deterrent effect because the American law enforcement agency engaged in a "joint venture"

24-10300                Opinion of the Court                21

with the foreign law enforcement agency.[8]  *United States v. Behety*, 32 F.3d 503, 510–11 (11th Cir. 1994) (alteration adopted); *United States v. Frank*, 599 F.3d 1221, 1227–29 (11th Cir. 2010).  The joint venture rule deters American law enforcement from using "circuitous and indirect methods" to circumvent the Constitution,

---

[8] When foreign officials conduct a search *outside* the United States, we would find a "joint venture" if "American law enforcement officials substantially participate[d] in the foreign search, or if the foreign authorities actually conducting the search were acting as agents for their American counterparts." *United States v. Rosenthal*, 793 F.2d 1214, 1231 (11th Cir. 1986); *see also Stonehill v. United States*, 405 F.2d 738, 744 (9th Cir. 1968) (finding no Fourth Amendment violation when American law enforcement provided information to foreign authorities but did not participate in what would have been an illegal raid had it been performed by American law enforcement, but was instead carried out by a FLEA).  We have never found a joint venture when the search occurred abroad, even when American involvement was notable.  *See, e.g.*, *Rosenthal*, 793 F.2d at 1230–31 (finding no joint venture where American agents were present at the search); *United States v. Morrow*, 537 F.2d 120, 139–41 (5th Cir. 1976) (finding no joint venture where Americans transmitted "the name and telephone number of a possibly valuable informant across national borders").

We have never decided whether a search that implicates the Fourth Amendment occurs when a foreign government traces an IP address of unknown origin to a location that happens to be in the United States.  We need not do so here because Spearman argues, and the government does not contest, that the search occurred on American soil.  And in this case, we need not decide whether American law enforcement participation in FLEA searches that occur in the United States must be "substantial" to create a joint venture that implicates the Fourth Amendment because Spearman does not plausibly allege the FBI's participation in the search, substantial or otherwise, or that the FLEA acted as an agent of American law enforcement.

such as by using agents to do what American law enforcement could not.[9] *Byars v. United States*, 273 U.S. 28, 32 (1927).

With this legal background in mind, we turn to the allegations in Spearman's suppression motion to assess whether, if true, they would prove a "joint venture" between the FBI and FLEA—the sole exception that Spearman presses on appeal. As discussed above, to have been entitled to a hearing, Spearman must have specifically and concretely alleged plausible, detailed facts that would show a violation of the Fourth Amendment. *Richardson*, 764 F.2d at 1527.

Spearman generally alleges the existence of a "partnership" between the FLEA and the FBI. In support of this general allegation, he alleges three key facts: (1) use of offensive code was required to discover his IP address, (2) the FLEA used that code, and (3) that the FBI "knew of and acquiesced" in the FLEA's intrusive conduct as part of their partnership. Nowhere in his motion to suppress does Spearman claim the FBI ordered the FLEA to undertake the search or helped the FLEA carry it out. And he does not otherwise provide specific details of how the "partnership" allegedly functioned, beyond alleging general information sharing and joint interests between the FBI and FLEA.

---

[9] Our traditional rules for agency relationships, albeit in other contexts, require "control by the principal over the actions of an agent." *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003).

Taken as true, none of these alleged facts would warrant suppression.

Spearman's first allegation, that a "partnership" existed generally, is easily dispensed with. Merely alleging the existence of a partnership without more details to show the scope of such partnership is both conclusory and insufficiently detailed to show the "joint venture" our case law requires. *See Richardson*, 764 F.2d at 1527 (finding that in a motion to suppress, "[a] court need not act upon general or conclusory assertions founded on mere suspicion or conjecture, and the court has discretion in determining the need for a hearing"). Accordingly, Spearman's allegation that a partnership existed between the FBI and the FLEA, on its own, does not require an evidentiary hearing that there was a "joint venture"

Spearman's other allegations warrant closer consideration, though they too ultimately fail. He alleges that use of offensive code was required to discover his address, the FLEA used that code, and the FBI "knew of and acquiesced" in the FLEA's intrusive conduct as part of a partnership with the FLEA. The question is thus whether this set of alleged facts is enough to allege a joint venture such that it would be an abuse of discretion not to hold a hearing. *See Richardson*, 764 F.2d at 1527. We hold that it is not.

Even accepting Spearman's suggestion that we should infer from his allegations that the FBI provided the offensive code used by the FLEA and that code was used to obtain his identity, sharing technology and relevant usernames in an investigation of a

transnational criminal enterprise can, at most, be considered cooperation, not agency. *See Behety*, 32 F.3d at 510–11; *Rosenthal*, 793 F.2d at 1230–31; *see also Stonehill*, 405 F.2d at 744. We have recognized that "normal lines of communication between the law enforcement agencies of different countries are beneficial without question[,] . . . are to be encouraged," and do not violate the Fourth Amendment. *United States v. Morrow*, 537 F.2d 120, 140 (5th Cir. 1976). Spearman did not allege the FBI knew how the FLEA would use the technology or where the ultimate perpetrator would be discovered. Nor did he allege that the FBI provided the code to the FLEA so the FLEA could perform a search that the FBI could not under our Constitution. The FLEA still had significant independent work left to do after receiving the tip from the United States, including finding a way to convey the code to Spearman's computer. We cannot say that the FBI's alleged information sharing here indicates FBI involvement that would subject the search to Fourth Amendment scrutiny.

Accordingly, because the degree of cooperation alleged by Spearman is either conclusory or does not rise to the involvement level that implicates the Fourth Amendment, the district court did not abuse its discretion in declining to hold an evidentiary hearing based on Spearman's argument that a joint venture occurred between the FBI and a foreign government. *See Richardson*, 764 F.2d at 1527.

2.    Spearman cannot show plain error on his claim that a search by a foreign sovereign on American soil always implicates the Fourth Amendment and necessitated a suppression hearing

Alternatively, Spearman argues that we need not consider the joint-venture doctrine because any search by a foreign sovereign on American soil is subject to Fourth Amendment scrutiny.  As discussed, in his suppression motion, Spearman alleged the FLEA used "offensive code" to obtain his IP address. Such code requires transmission to the physical components of a computer, which here was located in Alabama.  So, Spearman argues, because the search of his computer required sending code to a computer that was physically in the United States, the search should be subject to Fourth Amendment scrutiny even if conducted by a foreign government.

The government raises two arguments in response.  First, the government points out that Spearman failed to make this argument below and it is thus subject to plain error review, a burden which it argues Spearman cannot meet.  Second, the government argues that the "general rule" against exclusion of evidence obtained by foreign authorities applies even to searches that occur on American soil.[10]

---

[10] As noted *supra* n.8, because the government does not contest Spearman's argument that the search was on American soil, we need not address that issue for the first time.  Further, because we review for plain error only, we need

The question of whether all searches by foreign sovereigns on American soil are subject to the Fourth Amendment is an issue of first impression in this circuit.  In each case where we have addressed Fourth Amendment claims involving evidence obtained by a foreign government, we have limited our holdings to searches carried out on foreign soil and under foreign law.  We have held that "the fourth amendment exclusionary rule does not apply to arrests and searches made by foreign authorities on their home territory and in the enforcement of foreign law." *Morrow*, 537 F.2d at 139; *see also Birdsell v. United States*, 346 F.2d 775, 782 (5th Cir. 1965); *Rosenthal*, 793 F.2d at 1230 (same); *Gov't of Canal Zone v. Sierra*, 594 F.2d 60, 72 (5th Cir. 1979) (same).  We later reaffirmed "[t]he general rule is that evidence obtained from searches carried out by foreign officials in their own countries is admissible in United States courts." *Emmanuel*, 565 F.3d at 1330; *see also Behety*, 32 F.3d at 510 ("The Fourth Amendment is generally inapplicable to actions carried out by foreign officials in their own countries enforcing their own laws.").

Spearman asks us to resolve this open question.  But as the government pointed out (and Spearman did not contest), Spearman did not raise the "any search on American soil" argument in his suppression motion before the district court.  This

---

not decide whether, even if such a search occurs on American soil, it would violate the Fourth Amendment, because "there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving" a legal issue. *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003).

new theory therefore faces plain error review, for "[w]e review for plain error any theories supporting a motion to suppress that were not raised below." *United States v. Bruce*, 977 F.3d 1112, 1116 (11th Cir. 2020); *see also Young*, 350 F.3d at 1305.

Plain error review is a demanding standard, and one Spearman cannot meet. For plain error to have occurred, "the error must be one that is obvious and is clear under current law." *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013).[11] Indeed, "[i]t is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003).

Here, while we have resolved cases involving searches by foreign sovereigns on foreign land, we have never addressed whether a foreign sovereign's search on our soil violates the Fourth Amendment. *See, e.g.*, *Emmanuel*, 565 F.3d at 1330; *Behety*, 32 F.3d at 510; *Birdsell*, 346 F.2d at 782. So, even reading that caselaw in the light most favorable to Spearman, in describing the "general rule" as applying to foreign searches on foreign land, the most we may

---

[11] The test for plain error has four prongs: (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are met, then a court may exercise its discretion to correct the error if (4) the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Madden*, 733 F.3d at 1320. Because this case can be resolved on the first two steps (that there was no error that was plain), we do not address the final two steps.

have done was suggest or imply that we might take a different view if the search occurred on American soil. We have never embraced Spearman's position that all searches by foreign sovereigns on American soil are subject to the Fourth Amendment's exclusionary rule, even in dicta. *Id.* Thus, we cannot say that any plain error occurred. *See Madden*, 733 F.3d at 1322.

### B.    The district court did not abuse its discretion in imposing a life sentence on Spearman

Spearman also argues that his sentence is substantively unreasonable because the district court did not properly consider his extraordinary mitigating factors. Spearman raises three arguments in support of this claim. First, he claims that the district court effectively discounted his military service to irrelevance by merely stating that a life sentence remained appropriate despite his service because of the severity of his offense. Second, he argues the district court did not adequately consider Dr. Swan's testimony that he suffered from severe PTSD that, when combined with his sexual abuse as a child, business failures, and deaths within the family, led Spearman to self-soothe by engaging in irregular sexual conduct. Finally, Spearman argues that the district court failed to adequately consider his low risk of recidivism, which, he contends, was supported by Dr. Swan's testimony. We disagree and hold the district court did not abuse its discretion in imposing a life sentence for Spearman's conduct.

A challenge to the substantive reasonableness of a prison sentence is reviewed for abuse of discretion. *United States v. Irey*,

24-10300                  Opinion of the Court                  29

612 F.3d 1160, 1188–89 (11th Cir. 2010) (en banc). "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Id.* at 1189 (quotation omitted). And while "we do not automatically presume a sentence within the guidelines range is reasonable, we ordinarily . . . expect [such] a sentence . . . to be reasonable." *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) (quotation omitted).

The relevant factors a district court must consider in imposing a sentence on a criminal defendant are laid out in 18 U.S.C. § 3553(a).[12]   Under that statute, a district court must

---

[12] In full, those factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for--

consider, among other factors, "the nature and circumstances of the offense and the history and characteristics of the defendant." *Hunt*, 526 F.3d at 746 (citing 18 U.S.C. § 3553(a)(1)). The district court must also ensure it "impose[s] a sentence that is 'sufficient, but not greater than necessary' to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from further crimes of the defendant." *Butler*, 39 F.4th at 1355 (quoting 18 U.S.C. § 3553(a)(2)).

We are highly deferential to the district court's balancing of the § 3553(a) factors: "[T]he weight given to each [§ 3553(a)] factor is committed to the sound discretion of the district court," and we "will not second guess the weight given to a § 3553(a) factor so long as the sentence is reasonable under the circumstances." *Id.* Thus, we will vacate a sentence as substantively unreasonable only when we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range

---

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines

. . .

(5) any pertinent policy statement . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (quotation omitted).

This deference is fatal to Spearman's arguments against his life sentence. As an initial matter, Spearman's sentence was within the range provided by the sentencing guidelines and as calculated by the probation officer assigned to the case. While being inside the guideline range does not "automatically" ensure life imprisonment was reasonable, it is strong evidence of the same. *See Hunt*, 526 F.3d at 746.

Further, the district court confirmed that it was not persuaded that the mitigating factors cited by Spearman warranted a downward variance in light of the § 3553(a) factors, including (1) the "seriousness of the offense" (based on, *e.g.*, the "astounding" nature of the material posted on Website A, Spearman's conduct as the website's lead administrator, and Spearman's status as the FBI's most wanted child pornography target); (2) the "danger to society" Spearman posed (based on, *e.g.*, the significant collection of child pornography found in Spearman's garage, Spearman's operation of other child pornography websites, and his seeming use of the "concealment tactics and . . . sophisticated knowledge" he acquired in the military to run the website); and (3) the need to promote "[g]eneral deterrence." This rundown of the relevant facts and their relation to the § 3553(a) factors was more than sufficient to show the district court gave serious consideration to the § 3553(a) factors and all the evidence Spearman presented. *See United States v. Sanchez*, 30 F.4th 1063, 1078–79 (11th Cir. 2022)

(upholding a life sentence for a defendant convicted of child sex crimes as substantively reasonable despite the defendant's previous military service).

Spearman complains that the district court did not give greater weight to testimony about his mental health and low risk of recidivism from his psychological expert, Dr. Swan, but he misunderstands the district court's obligation at sentencing. We have repeatedly held that mere acknowledgment of the sentencing factors and evidence relevant to them shows the district court considered them. *See Butler*, 39 F.4th at 1355. Indeed, we have held that "[a] district court's failure to discuss mitigating evidence does not indicate that the court erroneously ignored or failed to consider the evidence." *Id*. at 1356 (quotation omitted and alteration adopted). "[A] district court's acknowledgment that it has considered the § 3553(a) factors and the parties' arguments is sufficient." *Id*. And here, the district court explicitly stated that it had considered the § 3553(a) factors, Dr. Swan's report, the "extensive testimony [and] hours of witness presentation," "the entire record," and Spearman's mitigation arguments, including his military history and mental health issues. This statement was sufficient to show that the district court adequately considered all of Dr. Swan's testimony given in mitigation. *Butler*, 39 F.4th at 1355; *see also Sanchez*, 30 F.4th at 1078–79 (upholding a sentence as substantively reasonable despite the district court rejecting the defendant's argument that he posed a low risk of recidivism).

Neither are we convinced by Spearman's arguments that the district court failed to adequately consider his decorated military service. The district court expressly discussed his military service and explained why it did not warrant a downward variance given "the unspeakable nature of [Spearman's] crimes." As noted previously, the weight to be afforded the sentencing factors "is committed to the sound discretion of the district court." *Butler*, 39 F.4th at 1355. The court reasonably exercised its discretion when it found that Spearman's military service, while "hard to discount," did not outweigh the disturbing nature of Spearman's crimes, particularly since Spearman seemed to use his military experience to run Website A. While a contrary decision may have also been permissible, the district court did not abuse its discretion in concluding Spearman's military experience did not mitigate his crimes.[13]

In summary, the weight of these § 3553(a) factors relative to the mitigating factors cited by Spearman was a determination that fell within the district court's sound discretion, *see Butler*, 39 F.4th at 1355, and the sentence the district court imposed was reasonable for the very reasons it cited. Accordingly, we conclude that the

---

[13] Spearman's reliance on the Supreme Court's precedent in *Porter v. McCollum* is unavailing, for *Porter* addressed an entirely different issue than the one before us. 558 U.S. 30 (2009). In *Porter*, the Supreme Court ruled that a habeas petitioner was prejudiced by his counsel's failure to investigate or present evidence of his military service to the trial court—not that the trial court would have abused its discretion had it failed to lower his sentence after considering this military service. *See id.* at 43–44.

sentence was substantively reasonable, and the district court did not abuse its discretion in imposing a guideline sentence of life imprisonment on Spearman.

## IV.    **Conclusion**

Spearman's conviction and sentence are affirmed.

**AFFIRMED.**

24-10300                KIDD, J., Dissenting                1

KIDD, Circuit Judge, dissenting:

A two-hour suppression hearing. That is all Spearman requested. He credibly alleged that the FBI was cooperating with a foreign law enforcement agency. We know this to be true because that foreign agency provided his IP address to the FBI. Spearman suspected, but could not prove, that the FBI worked with the agency to obtain his IP address without the search warrant that would be required in the United States. *See United States v. Conroy*, 589 F.2d 1258, 1265 (5th Cir. 1979) ("The mere consent of foreign authorities to a seizure that would be unconstitutional in the United States does not dissipate its illegality even though the search would be valid under local law."). So he asked for two hours of the district court's time to probe the extent of the foreign law enforcement agency's involvement in his identification. The district court denied him this valuable tool to aid his defense. And now, so do we.

Federal criminal discovery is limited—too limited, in my view. A contrast with federal civil discovery is illustrative. In a civil case, if the discovery indicates that a person might have knowledge of an event that is not otherwise reduced to writing, a party seeking that knowledge has several options. The party can send that person an interrogatory. Fed. R. Civ. P. 33. Or a request for admission. Fed. R. Civ. P. 36. Or take that person's deposition, either orally or by written questions. Fed. R. Civ. P. 30, 31.

Not so in the criminal context. "There is no general constitutional right to discovery in a criminal case . . . ." *Weatherford*

2                    KIDD, J., Dissenting                    24-10300

*v. Bursey*, 429 U.S. 545, 559 (1977). The only statements a criminal defendant is entitled to receive are the defendant's own statements. Fed. R. Crim. P. 16(a)(1)(A), (B). Otherwise, the single rule in the Federal Rules of Criminal Procedure concerning discovery requires only that the government turn over "books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items." Fed. R. Crim. P. 16(a)(1)(E).[1]

But if the government obtains evidence in violation of the Fourth Amendment, the evidence must be suppressed. *See Weeks v. United States*, 232 U.S. 383, 391–93 (1914), *overruled in part on other grounds by, Elkins v. United States*, 364 U.S. 206 (1960). And defendants are typically afforded a hearing to present evidence of any alleged violation. Critically, if a government agent's knowledge is not reduced to writing, then a hearing often is the *only* mechanism a criminal defendant can use to probe that person's knowledge.

In this case, the discovery allowed Spearman specifically to allege:

1.  In June 2022, after "infiltrat[ing]" Website A, the FBI used "offensive technical operations" to identify the IP address of one of the operators of Website A (not Spearman).

---

[1] Of course, the government also has constitutional disclosure obligations, such as those imposed by *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), and statutory ones, such as those required by the Jencks Act, 18 U.S.C. § 3500, but none of those limited obligations are at issue in this case.

24-10300　　　　　　　Kɪᴅᴅ, J., Dissenting　　　　　　　3

Spearman supported this allegation with a citation to official FBI reports.

2.  In August 2022, a foreign law enforcement agency provided the FBI with the IP address of someone who "managed" Website A. Spearman supported this allegation with a citation to the search warrant application for his home.

3.  The FBI "issued administrative subpoenas for subscriber information" associated with the IP address and "identified Mr. Spearman as the subscriber connected to that address." Spearman did not cite the source of this information, but it appears in an official FBI report that Spearman submitted as an exhibit.

4.  The foreign law enforcement agency "has a 'long history' of 'sharing criminal investigative information with U.S. law enforcement' related to 'the investigation of crimes against children,' and . . . 'it is common practice' to share such information with each other" even though there was no formal agreement to do so. Spearman quoted this language from the search warrant application for his home.

5.  The FBI case agent stated in the sworn search warrant affidavit that "'[t]he FBI *and its foreign partners*' had identified Mr. Spearman as being involved in Website A." (emphasis in original).

Our predecessor Court previously explained that "a [suppression] hearing is required" if "the moving papers, including affidavits if any are filed, are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *United States v. Smith*, 546 F.2d 1275, 1280 (5th Cir. 1977) (citation modified). In my view, Spearman met that burden. He made specific, nonconjectural allegations that the FBI partnered with a foreign law enforcement agency to identify him. Each of his allegations was supported by the FBI's own words, including the case agent's sworn affidavit.

The majority appears to agree with the district court, which criticized Spearman for not "offer[ing] declarations, affidavits, or other evidentiary materials from witnesses or persons with knowledge from which the Court could conclude that a joint venture occurred." We have now seen that Spearman *did* offer "affidavits" and "other evidentiary materials from . . . persons with knowledge." Presumably the district court wanted more information. But how would Spearman be able to obtain any additional declarations, affidavits, or evidence?

The only "witnesses or persons with knowledge" of a joint venture between the U.S. government and the foreign law enforcement agency would be the very people Spearman sought to examine at a hearing: the government agents who worked on the case. Spearman cited their reports and their sworn search warrant affidavit. The district court had the power to compel those agents to submit additional declarations regarding any cooperation

24-10300                    KIDD, J., Dissenting                    5

between the two agencies if the court wanted more details before granting a hearing. But it did not do so. And Spearman himself, powerless under our criminal justice system, had no mechanism by which to do so.

What additional information would the majority require before Spearman could obtain a suppression hearing? The majority finds that Spearman needed to credibly "claim the FBI ordered the FLEA to undertake the search or helped the FLEA carry it out" and to "provide specific details of how the 'partnership' alleged functioned," including that "the FBI knew how the FLEA would use the technology or where the ultimate perpetrator would be discovered" and that "the FBI provided the code to the FLEA." In other words, Spearman needed to specifically "*prove* a 'joint venture' between the FBI and FLEA." Majority Op. 22 (emphasis added).

The majority offers no guidance as to how a defendant like Spearman, lacking any discovery tools and not privy to the internal workings of the FBI and its dealings with foreign law enforcement agencies, might gather these "specific details." The only answer I can offer is exactly what he tried to do: request a hearing.

The majority's holding impacts any defendant who has reason to believe that the U.S. government might be cooperating with a foreign government to violate his or her constitutional rights. It places those defendants in a classic catch-22 situation: To establish entitlement to a hearing, a defendant must present evidence that only a hearing would uncover. If Spearman had the

6                          KIDD, J., Dissenting                    24-10300

information that he sought to uncover, then he would not need a hearing; he could simply present, as the district court demanded (and the majority endorses), the "declarations, affidavits, or other evidentiary materials from witnesses or persons with knowledge from which the Court could conclude that a joint venture occurred." But Spearman did not have this information that only a hearing could uncover. So he gets no hearing.

A suppression hearing is one of the few tools available to criminal defendants to probe the extent of the government's intrusion upon their "persons, houses, papers, and effects." U.S. CONST. amend. IV. Because I disagree with the height of the majority's hurdle to obtain this essential tool to vindicate a constitutional right, I respectfully dissent.